Filed 1/11/21  P. v. Briseno CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B297164 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA088460) |
| v. | |
| FRANK BRISENO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David W. Stuart, Judge.  Reversed as to count two, remanded in part with instructions and affirmed in all other respects.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Frank Briseno of eight counts arising from the assault of victim Angela and the kidnapping and rape of victim Claudia.  Appellant raises a staggering 24 issues on appeal, including multiple challenges to the admission of uncharged sex offenses against a third victim, Ashley; challenges to the assault conviction; arguments regarding the omission of lesser included instructions, and several claims regarding enhancements and sentencing.  We agree with appellant that reversal of his conviction on count two for kidnapping is warranted, as it is a lesser included offense of his count three conviction for aggravated kidnapping.  We otherwise reject his numerous assertions of error and affirm his convictions.  However, we conclude that remand is appropriate to allow the trial court to exercise its independent discretion whether to strike the prior serious felony conviction enhancement.  Conversely, defendant has forfeited any challenge to the imposition of fines and fees at his sentencing, and therefore we decline to remand on that additional basis.  We also direct the trial court to correct the judgment with respect to certain fines and fees imposed.

## PROCEDURAL HISTORY

On November 16, 2018, the Los Angeles County District Attorney filed an amended information charging appellant with the following nine counts:  assault with intent to commit a felony (Pen. Code, § 220[1]; count one); kidnapping (§ 207, subd. (a); count two); kidnapping to commit rape (§ 209, subd. (b)(1); count three); four counts of forcible rape (§ 261, subd. (a)(2); counts four, five, seven, and eight); forcible oral copulation (§ 288a, subd. (c)(2);

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

2

count six); and second degree robbery (§ 211; count nine). The amended information alleged that appellant committed count one against Angela on June 24, 2004, and the remaining counts against Claudia on July 12, 2004.[2] The amended information further included One Strike kidnapping allegations under section 667.61 (counts four through eight) and a firearm use enhancement under sections 12022.3, 12022.53, and 12022.5 (counts two through eight). Additionally, as to all counts, it was alleged that appellant suffered a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and two prior serious felony convictions (§ 667, subd. (a)(1)).

The jury acquitted appellant on count eight and found appellant guilty on all other counts. The jury also found the enhancement allegations true. The court sentenced appellant to a total prison term of 50 years to life, plus 80 years, consisting of the following: on count one, the upper term of six years, doubled pursuant to appellant's prior strike, plus five years for the prior serious felony convictions (§ 667, subd. (a)(1)); on count four, a consecutive term of 25 years to life,[3] doubled, plus additional consecutive terms of 10 years for the firearm enhancement (§ 12022.53, subd. (b)), and five years for the prior convictions

---

[2]Appellant was apprehended in Mexico in 2013. He was initially charged with offenses against Angela, Claudia, and Ashley, but those charges were dismissed when Ashley refused to cooperate. The People refiled the charges involving Angela and Claudia in 2017.

[3]On counts four through seven for rape and oral copulation, the court applied the sentencing scheme pursuant to section 667.61, commonly known as the "One Strike" law (see *People v. Anderson* (2009) 47 Cal.4th 92, 99).

(§ 667, subd. (a)(1)); and on counts five through seven, consecutive terms of eight years each, doubled. The court also imposed a 16 year term on count two, a life term on count three, and a 10 year term on count nine, but stayed those sentences pursuant to section 654. The court also imposed $140 in court security assessments, as well as a $200 restitution fine and a $200 parole restitution fine. Appellant timely appealed.

## FACTUAL BACKGROUND

### I. *Prosecution Evidence*

#### A. *Angela*

Angela testified that on the morning of June 24, 2004, when she was about 21 years old, she went for a run at El Cariso Park in Sylmar, California. As she was running, she noticed a man leaning against a tree and it "brought about a weird feeling in my stomach." She continued her run up a hill behind the golf course and felt someone coming up behind her. She moved to the side, thinking the person was going to pass her. As she did, the person put both arms around her and grabbed her from behind "like he was going to take me down." He then pulled her pants down to her thighs. Angela testified that she thought he was going to rape her. She said, "please, don't," and stepped backwards to push the man back, causing him to fall. Angela glanced back and saw the same man she had seen leaning on the tree earlier. At trial, she identified appellant as her assailant.

Angela testified that she ran away and called 911. She told the 911 operator that she was running in the park, and "a guy came up from behind me and he tried to . . . rape me." She also stated that he "tried to pull down my pants." She described her assailant as a Hispanic male in his 20's, with a medium build.

4

A few weeks after the attack, on July 12, 2004, the police showed Angela a photographic six-pack lineup. The lineup did not include a photo of appellant. Angela was unable to make an identification from the lineup. On July 16, 2004, she saw a news bulletin on television about a rapist with a photo of appellant. At trial, Angela testified that when she saw the news bulletin, "I knew it was the same person that did that to me." However, during cross-examination she acknowledged that she told the police on July 16, 2004 that she was not sure whether it was the same person who attacked her. Later that day, detective Teresa Curtis of the Los Angeles Police Department (LAPD) came to her house and showed her the same picture of appellant. At that point, Angela testified that she "felt that it was him," and began shaking and crying. Detective Curtis also testified that when she met with Angela and showed her appellant's photo, Angela "immediately started to shake and started to cry," and said that appellant was the person who assaulted her. At trial, Angela described her assailant as a Hispanic man in his mid-20's, with a fade haircut and mustache, wearing blue pants and a white shirt.

Hugh Hoopes testified that he was at the park with his child on June 24, 2004. He noticed a man coming from the direction of the golf course and "meandering" past him, and he thought it was "kind of weird" because he had not seen that man anywhere else in the park. He described the man as Hispanic, five foot six inches, between 150 and 180 pounds, in his mid-20's, wearing a white T-shirt and blue jeans, with a thin mustache. About 20 minutes later, the police arrived and asked him if he had seen anything suspicious. He told the police about the man, whom he said was acting suspiciously. The police also told Hoopes that someone had been raped in the park bathroom.

5

About two months later, he picked a photograph of appellant out of a six-pack lineup as the closest resemblance to the man he had seen.

B.    *Claudia*

In the afternoon on July 12, 2004, 20-year-old Claudia got off the bus near her home in Arleta, California, after a trip to the store. Claudia testified that as she started walking home, she noticed a "strange man" inside a gray Ford Focus looking at her. She identified that man at trial as appellant. Appellant got out of his car and asked if she wanted a ride home. She said no and kept walking. As she approached an alley, appellant stopped his car in the alley's entrance, got out of the car again, and came up behind her. Claudia said that appellant grabbed her around the neck, pointed a gun to her head, and told her to "get in the car and do not make anything complicated."

Appellant pushed her into the front passenger seat of the car and told her not to make any movements. He then drove the car a little more than halfway down the alley, which she estimated was about 18 houses into the alley from the street. Appellant parked the car with the passenger doors close to a wall so that Claudia could not get out. They sat in the car for five minutes without either one saying anything. Then appellant pulled down his shorts. He told Claudia to suck his penis and she complied.

After a few minutes, appellant pushed Claudia onto her side, removed her shoes, and pulled down her pants. He moved over to the front passenger seat on top of her and began penetrating her vagina with his penis. Claudia told the police that prior to penetrating her vagina, appellant spit into his hand as a form of lubricant. After a few minutes, appellant told

6

Claudia to move to the back seat.  She complied, he followed, and then began penetrating her vagina with his penis a second time.  After about five minutes, appellant moved Claudia from behind the driver's seat to behind the passenger's seat and began penetrating her vagina again.  She stated that she was crying and asking him to stop, but he did not listen.

After several more minutes, he shifted her to the other side of the back seat again and began penetrating her vagina a fourth time.  Claudia saw a green Jeep driving by the alley, and saw appellant looking at the driver.  She started to try to give the driver a sign, but appellant told her not to do anything, if she did not "wanna die right there."  During the incident, appellant's gun was on the seat next to them, but then it fell to the floor of the car.

After the Jeep passed by, appellant moved Claudia again and penetrated her briefly.  She asked him not to "finish in me because I don't want to be pregnant."  Appellant responded:  "I'm not stupid enough to leave evidence."  After that, he withdrew his penis and ejaculated on the back seat of the car.

Appellant then pulled up his pants and went back to the front seat.  Claudia began to pull up her pants and appellant threw her shoes from the front seat to the back.  She asked if she could go and he said she could.  Once she was outside the car, appellant handed her a piece of paper with the name Jose and a phone number written on it.  He told her:  "Here's my phone number.  If you want to call the cops, go ahead.  I don't care.  You know, I had already killed someone three days ago and they are looking for me."  Appellant told her he was going to fill up his gas tank and leave for Oregon.  He also told her that she "was lucky enough that he left me alive, because usually . . . when he does

that to the girls, he kills them after he does that to them."

Claudia asked appellant for her purse, which was still in the car and contained her identification, a Universal Studios season pass, and her cell phone. Appellant refused, drove down the alley, and left. Claudia left the alley and encountered someone she knew on the street. He saw her crying and asked if she needed anything. She asked him to take her around the corner to her neighbor's house so that she could get to a phone. He drove her there and her neighbor's husband let Claudia use his phone to call the police.

Claudia testified that she was "crying, shaking" during her 911 call. She told the police that about six minutes earlier, she had been assaulted at gunpoint and raped in an alley by a "Mexican guy." She reported that the assailant pointed a gun to her head and told her if she did not get into his car that he would kill her. She described the assailant as in his 20's, almost bald, and driving a gray Ford Focus.

About an hour after the assault, Claudia was interviewed by police and examined by a Sexual Assault Response Team (SART) nurse. Afterward, LAPD detective John Alviani and his partner accompanied Claudia to the crime scene. There, they saw Angel Cornejo, the man who had been driving the green Jeep during the assault. Detective Alviani testified that the rape occurred approximately 18 houses down the alley from the street. The alley has the backs of single family residences on either side, with access for the residential garages. Alviani testified that it is "more remote" than the street.

Police also prepared a sketch based on Claudia's description. She described her assailant to the police as having a "blackish-reddish" beard, "a little bit" of black spiky hair on his

8

head, medium build, about five foot six inches tall, and 150 pounds. A few days after the assault, Claudia reviewed a photographic six-pack lineup that included a photo of appellant's brother, Carlos Grimaldi, but no photo of appellant. Claudia identified Grimaldi as her assailant.

Angel Cornejo, the driver of the green Jeep Cherokee, testified that in 2004 he lived in a house that backed up to the alley where the assault occurred. His garage was accessible through the alley. On the afternoon of July 12, 2004, he was returning home and drove down the alley to park. As he drove down the alley, he passed a parked vehicle facing the other way and saw two people in the backseat. He thought they were going to have sex and did not think anything further of it. The man in the vehicle looked at him and the woman sat up and looked at him for a few seconds as he drove past. Cornejo identified appellant at trial as the man he saw in the car.

The parties stipulated that appellant's DNA matched samples taken from Claudia's pants worn the day of the incident and from the backseat of the Ford Focus. They also stipulated that appellant's fingerprints were found on dance club flyers discovered inside the Ford Focus. The scrap of paper appellant handed Claudia appeared to come from one of the flyers.

C.     *Ashley – uncharged acts*

Ashley testified that she was 14 years old in 2004. On the morning of July 13, 2004, she was walking to work on Van Nuys Boulevard when a man in a vehicle approached her. She was forced into the car. She testified that she remembered that she was raped, but did not remember any of the details. She also recalled telling her coworkers what happened that day and participating in a suspect drawing with a police sketch artist.

9

LAPD Detective John Eum testified that he met with Ashley on July 13, 2004, along with his partner and a SART nurse. According to Eum, Ashley reported that while she was walking to work, a man drove up next to her and asked repeatedly whether she needed a ride. She said "no" and continued walking. Eventually, the man parked his car, got out, and started walking with her. After she told him "no" again, he got back in the car, pulled up next to her, pointed a gun at her, and told her to get in the car. Ashley complied.

Once she was in the car with the man, he drove her to Arleta and parked in an alley. Ashley reported that after he parked the car, the man reclined her seat back and then reached into her shirt and touched her breasts. She pulled his hands away and he exclaimed: "What the 'f' are you doing? I told you just do what I say." Then the man pulled down his pants and demanded that she "jack him off." After making her masturbate him, he made her orally copulate him. Next, Ashley stated that the man spit into his hand and put it on his penis, then climbed over to the passenger seat on top of her and put his penis into her vagina. At some point, he made Ashley move into the back seat, where he again inserted his penis into her vagina. The man told her not to tell anyone because he had already killed somebody, the police were looking for him, and he was going to flee to Colorado. Afterward, the man dropped Ashley off at her workplace, which scared her because she had not told him where she worked.

According to Eum, Ashley described her assailant as white or light-skinned Hispanic, about 20 years old, with brownish-reddish hair and a mustache. During the first interview, Ashley stated that it was a white compact car with gray interior. But

later, when detectives met with her again, they showed her pictures of the gray Ford Focus that had been recovered and she said that was the car.

Ashley was shown a six-pack photographic lineup that did not include appellant's photo on July 15, 2004. She was not able to make an identification. After police asked her to eliminate photos, she eliminated four of them and wrote that the remaining two photos looked like her assailant, but she was not sure. One of the remaining photos was of appellant's older brother, Carlos Grimaldi. Grimaldi is three and a half years older than appellant. Eum investigated both brothers in 2004 and opined at trial that their photos "look almost exactly alike." Ashley was never shown a photo of appellant.

D.     *Additional Investigation*

On July 13, 2004, LAPD officer Michael Hammett responded to a call regarding suspicious activity in a vehicle in Arleta. He arrived at the scene at 11:05 p.m. and saw appellant lying down in the back of a gray Ford Focus. Appellant gave his name as Javier Lopez and an address on Stanwin Avenue in Arleta. He told the officer that the vehicle was his friend's car and his friend had let him sleep there after appellant had been kicked out of his mother's house a few nights before. Hammett ran the vehicle's license plate and discovered that it was not registered to Javier Lopez (or as a later check revealed, to Frank Briseno), or to the Stanwin address he gave. Hammett testified that he impounded the Ford Focus but released appellant because they did not have a basis to arrest him. Hammett noticed that the man he stopped had a tattoo of a naked woman on his forearm; the parties stipulated that this matched the tattoo on appellant's arm.

11

Detective Alviani, who was investigating Claudia's case, learned on July 13, 2004 that police had impounded a gray Ford Focus. He and his partner searched the vehicle and found Claudia's identification and Universal Studios pass in the front driver's side door panel.

Alviani also went to the Stanwin Avenue address appellant had given Hammett. They spoke with the resident, Blandina Ochoa. She said she did not know anyone named Javier Lopez (the name appellant gave Hammett). Alviani gave her a description of the suspect and showed her the composite sketch created with Claudia. Ochoa said she did not recognize the sketch and that she had one son, Carlos Grimaldi.

The detectives investigated Grimaldi, whose description and photo looked similar to the description provided by Claudia. They showed Claudia a six-pack photographic lineup including Grimaldi's photo, and she identified Grimaldi's photo. They took Grimaldi into custody on July 14, 2004. While Grimaldi was in custody, Alviani looked at Grimaldi's cell phone and saw an incoming call on July 13, 2004 made from Claudia's stolen cell phone number. The police ultimately ruled out Grimaldi as a suspect, released him, and turned their focus to his brother, appellant.

With Grimaldi's cooperation, police placed a pretextual call to Ochoa at her residence. Ochoa told Grimaldi that appellant was at the house. However, when police arrived, appellant was not there. In a search of the house, police discovered clothing in a closet including white and yellow Lakers shorts matching the ones appellant wore when he was detained by Hammett, knee-length gray shorts with black stripes, and plaid boxer shorts. Alviani testified that he believed the gray shorts matched the

12

length, material, and design of the shorts Claudia described her assailant wearing, although she stated the shorts were green with black stripes instead of gray. Alviani further testified that the boxer shorts matched the description given by Ashley as worn by her assailant.

Ashley's rape took place 0.4 miles from appellant's mother's house. The Ford Focus was recovered 0.2 miles from the house. Claudia's rape occurred less than a mile from the house. Angela's attack occurred seven miles from the house.

After the raid on the home, the police broadcast appellant's photo to the media with a crime bulletin regarding the kidnapping and rape of Claudia and Ashley. The case was also featured twice on the television show America's Most Wanted.

In 2013, the LAPD received information that appellant was in Mexico. Appellant was taken into custody in Mexico in July 2013 and transferred back to the United States.

## II. *Defense Evidence*

Defense expert Dr. Mitchell Eisen, a forensic psychologist, testified about human memory and issues with eyewitness identification. In particular, he opined that showing a single individual for identification purposes was inherently suggestive.

Appellant testified and denied raping Claudia or Ashley and denied ever owning a gun. He testified that he met Claudia in July of 2004. He was standing outside, leaning on the Ford Focus, when he saw her walking down the street. He spoke to her and they had a friendly conversation for 10 to 15 minutes. They agreed to "smoke some weed" together and appellant suggested they drive around the block. They got in the car and started to drive.

Appellant ultimately drove into the alley and parked to one side against the wall so as not to block any residential garages. Then they smoked marijuana together. They started "flirting" with each other and eventually had consensual sex in the back seat of the car. Afterward, they dressed and Claudia got out of the rear driver's side door. He then drove away. He denied giving Claudia a piece of paper with a name and phone number on it. He also denied that Claudia asked for her purse and claimed he did not know it was still in the car when he drove off. He testified that later his friends discovered the purse and went through it. He did not know how Claudia's identification and Universal Studios pass ended up in the front driver's side panel. He did take her phone, but did not remember what he did with it or whether he called his brother. He also said he did not know why Claudia would be crying and calling 911 six minutes after their encounter.

Appellant testified he had never been to the park where Angela was assaulted and never pulled down a jogger's pants. He denied offering Ashley a ride and claimed he was hanging out with friends the morning of July 13, 2004. He testified that he had never seen Ashley before.

Appellant testified that when he was stopped by Hammett, he was "resting" in the back seat of the Ford Focus. He testified that the car was not his; it was rented by someone else. He admitted giving the officer a made-up name because he knew there was a warrant out for him on another matter and he did not want to get arrested. He admitted to three prior felony convictions – a residential burglary, a 2003 assault by means likely to produce great bodily injury, and a 2003 spousal battery. He did not surrender to serve his jail time for the 2003 case, but

14

instead moved to Hollywood.

Appellant claimed that he did not know he was wanted on rape charges until he was arrested in 2013. He admitted that the Lakers shorts from his mother's house were his, but said the other clothing was not. He testified that he continued to live in Hollywood from 2004 to 2008 and then moved to Mexico because his child's mother was threatening to call the police for the outstanding 2003 warrant.

## DISCUSSION

Appellant's claims on appeal can be divided into several categories: (1) arguments that his conviction on all counts should be overturned because the court erred in admitting evidence regarding the uncharged offenses involving Ashley (issues 1 through 8); (2) challenges to the count one assault conviction involving Angela (issues 9 through 13); (3) assertions of instructional error regarding omission of lesser included offenses (issues 14 through 16); and (4) challenges to enhancements and sentencing, as well as a request for in camera review of an ex parte hearing (issues 17 through 24). Respondent also seeks correction of errors made to the imposition of fines and fees (issue 25).

**Issues 1-8: Challenges to Evidence of Uncharged Offenses Involving Ashley**

**I.**     ***Preliminary Finding of Identity as Foundation for Admission***

Appellant argues that the court erred in admitting evidence of appellant's uncharged offenses against Ashley because it failed to make a preliminary finding of fact that he was Ashley's assailant. We conclude the court was within its discretion to find that there was sufficient evidence of appellant's identity as

15

Ashley's assailant to allow the evidence to go to the jury.

A. *Factual background*

After refiling the charges against appellant without those involving Ashley, the prosecution did not call Ashley as a witness during the preliminary hearing. At trial, the prosecutor initially stated that she planned to call Ashley to testify as a rebuttal witness if appellant testified and denied the incident. The prosecutor noted the similarities in the crimes against Claudia and Ashley: "It was the same vehicle, it was at gunpoint, same M.O., same – similar facts, same verbiage, same threats . . . lots of other ways to connect the dots. And it also occurred two blocks from his house." Both parties acknowledged that Ashley had never been shown a photo of appellant and had never identified him. The court indicated it might allow some rebuttal if appellant testified. The prosecutor then stated, as an "alternative," that she wanted to present Ashley as a witness under Evidence Code section 1108 (section 1108) during her case in chief. The court stated it would consider the issue.

Subsequently, the court stated it had considered the request to present Ashley's testimony under section 1108 and decided it was "really not that close of a call. It's 1108 evidence. . . . I understand it's powerful testimony, but I don't see any actual unfair prejudice to the defendant here." The court detailed the "similarity between the two incidents," including where the incidents occurred, and that they occurred one day apart under "similar circumstances. And so it is certainly similar enough to submit to a jury."

The prosecution called Ashley as part of its case in chief. Prior to Ashley's testimony, the court instructed the jury that it would hear evidence of uncharged offenses and could consider

16

that evidence "only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense." Further, the court told the jury that if the prosecution did not meet this burden, it must "disregard this evidence entirely." If proven, the jury was instructed that it could, but was not required to, "conclude from the evidence that the defendant was disposed or inclined to commit sexual offenses and, based on that decision, also conclude that the defendant was likely to commit and did commit the charges in this case. . . . You may not consider this evidence for any other purpose."

B. *Legal Principles*

Section 1108 "is an exception to the general prohibition against admitting character evidence to prove criminal disposition or propensity." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 352–353 (*Jandres*); see also Evid. Code, § 1101, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) "In a sexual offense prosecution, the statute permits the admission of evidence that the defendant 'committed other sexual offenses to prove his propensity to commit the charged sexual offense[ ],' so long as the evidence is admissible under section 352." (*Jandres*, *supra*, 226 Cal.App.4th at p. 353, quoting *People v. Cottone* (2013) 57 Cal.4th 269, 281 (*Cottone*); see also § 1108, subd. (a).)

The admissibility of uncharged conduct under section 1108 may depend on the existence of a preliminary fact. Under Evidence Code section 403, when "[t]he relevance of . . . proffered evidence depends on the existence of [a] preliminary fact," the "proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact." (Evid. Code, § 403, subd. (a)(1).) "A defendant's identity as the person who committed an uncharged act is a classic example of a preliminary

17

fact necessary to establish relevance.  If it cannot be shown that the defendant did the uncharged act, the fact that 'somebody' did it is irrelevant.  [Citations.]  Under section 403, then, the trial court performs a threshold screening function to shield the jury from evidence that is so factually weak as to undermine its relevance." (*Cottone, supra,* 57 Cal.4th at p. 284.)

Thus, the trial court "must make a preliminary determination of whether the proffered evidence is sufficient for the jury to find, by a preponderance of the evidence," that the defendant committed the uncharged offense.  (*Jandres*, *supra*, 226 Cal.App.4th at p. 353; see also *Cottone, supra*, 57 Cal.4th at p. 282; *People v. Lopez* (2007) 156 Cal.App.4th 1291, 1299 ["the more lenient preponderance of the evidence standard" applies to prior sexual offense evidence admitted under § 1108].)  "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 466.)

"The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion." (*People v. Lucas, supra*, 12 Cal.4th at p. 466.)  Accordingly, we review the trial court's determination of preliminary facts under the abuse of discretion standard.  (See *Jandres*, *supra*, 226 Cal.App.4th at p. 353.)

C.      *Analysis*

Appellant contends there was insufficient evidence to identify him as Ashley's assailant and, therefore, that the evidence of the uncharged offenses should not have been admitted at trial.  He relies on a series of cases beginning with *People v. Albertson* (1944) 23 Cal.2d 550 (*Albertson*) for the

proposition that the court improperly "used the charged Claudia offenses and Claudia's identification of defendant as her assailant to establish the identity of defendant for the uncharged Ashley offenses."

Appellant's citation to *Albertson* to support his claim that the court erroneously admitted the Ashley offenses without proper proof that he committed those crimes is unavailing. In *Albertson*, the defendant was convicted of murdering an acquaintance based on "purely circumstantial" evidence that he mailed the victim poisoned vitamins. (*Albertson, supra,* 23 Cal.2d at p. 563.) The evidence consisted primarily of the uncertain identification by several witnesses involved with the preparation of the vitamin package. (*Id*. at pp. 563-565.) There was no evidence of motive or that the defendant placed the poison into the vitamins, even if he had mailed them. (*Id*. at p. 567.)

The Supreme Court reversed the defendant's conviction because the trial court permitted the prosecutor to introduce "hundreds of pages of testimony" regarding the suspicious circumstances of a prior assault of the victim approximately six weeks before the murder, where the victim was unable to identify his attacker. (*Id*. at pp. 568-569.) The same night, police found a car registered to the defendant's wife abandoned a mile away from the victim's home and found the defendant "in his underwear lying on a road." (*Id*. at pp. 569-571.) The court found that the evidence of the assault showed only a mere suspicion that Albertson might have been the assailant. (*Id*. at p. 578.) The court reasoned, "Circumstantial proof of a crime charged cannot be intermingled with circumstantial proof of suspicious prior occurrences in such manner that it reacts as a psychological factor with the result that the proof of the crime charged is used

to bolster up the theory or foster suspicion in the mind that the defendant must have committed the prior act, and the conclusion that he must have committed the prior act is then used in turn to strengthen the theory and induce the conclusion that he must also have committed the crime charged.  This is but a vicious circle.  Here the evidence of suspicious prior occurrences affords no substantial proof whatsoever connecting defendant in any way with the charge on which he was tried." (*Id*. at pp. 580-581.)

The other cases cited by appellant demonstrate a similar "bootstrap" process by which tenuous proof of charged and uncharged crimes are used in a "vicious circle" to strengthen each other.  For example, in *People v. Long* (1970) 7 Cal.App.3d 586, 591–592, the defendant was charged with passing a forged check. The court found it was error to admit evidence of three other forged checks, admittedly forged by someone else, based on an unsupported "suspicion" that the defendant had aided and abetted that forger.  The court concluded that "by a bootstrap process, the charged forgery was imputed to defendant by tenuous evidence of another forgery whose proof was so shaky that the prosecutor had dismissed it for lack of evidence. . . .  The prosecution tactic set in motion the vicious circle denounced in *Albertson*, *supra*.  In the eyes of the jury, defendant's possible guilt of the crime charged made probable his complicity in the other three forgeries, while his possible complicity in the other three forgeries made probable his guilt of the crime charged." (*Ibid*.; see also *People v. Martinez* (1992) 10 Cal.App.4th 1001, 1006, 1008 [error to admit expert testimony of profile evidence detailing unconnected theft crimes without any proof connecting them to the defendant]; *People v. Jackson* (1967) 254 Cal.App.2d 655, 658 [error to admit evidence of other crimes that were

20

unconnected to the defendant].)[4]

Here, the evidence of identity in both the charged and uncharged crimes was far stronger than that in the cases appellant cites. In contrast to these cases, the evidence of appellant's identity in Claudia's case was not circumstantial, it was undisputed.  Appellant admitted that he had sex with Claudia in the alley, but contended it was consensual, and denied kidnapping or robbing her.  Further, although Ashley did not identify appellant as her assailant, she did identify a photo of the same Ford Focus as the one used in her assault, and she selected a photo of appellant's brother as one of two she believed were closest to her attacker.  Moreover, as the trial court found, numerous similarities between the two crimes provided additional evidence that appellant committed both:  Ashley was attacked one day after Claudia, both victims reported that they were offered a ride and then forced into the car at gunpoint, both were driven to alleyways less than a mile from appellant's mother's home, both times the assailant spit into his hand before raping the victim, and the descriptions of the assailant by both Ashley and Claudia was similar.  In addition, both victims

---

[4]We also note that the key language from *Albertson* and *Long*—stating that "circumstantial proof of a crime charged cannot be intermingled with circumstantial proof of suspicious prior circumstances" (*Albertson, supra*, 23 Cal.2d at p. 580)—was to some extent derived from a rule that the truth of other crimes evidence must be proven by clear and convincing evidence, a standard that was expressly disapproved in *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382.  As the *Carpenter* court confirmed, the standard for admitting evidence of uncharged crimes is preponderance of the evidence.  (*Ibid.*)

21

reported that after the assault, the assailant told them he had already killed someone, the police were looking for him, and he was going to flee to another state.

Thus, the situation that concerned the courts in *Albertson* and *Long*—weak circumstantial evidence of a charged crime mixing with weak circumstantial evidence of uncharged crimes to lend credence to both—is not present here. The trial court did not abuse its discretion in concluding that there was sufficient evidence for the jury to find, by a preponderance of the evidence, that appellant committed the uncharged offenses against Ashley.

**II.    *Admission of Ashley Offenses Under Section 352***

Appellant also asserts that the court erred in admitting the uncharged offenses involving Ashley under Evidence Code section 352 because the evidence was substantially more prejudicial than probative. We disagree.

A.    *Legal Principles*

As discussed in section I, *ante*, section 1108 permits admission of evidence of the defendant's commission of another sexual offense, as long as the evidence is not inadmissible pursuant to Evidence Code section 352. (See *People v. Erskine* (2019) 7 Cal.5th 279, 295 (*Erskine*).) "Section 352 articulates the general rule that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*Id.* at p. 296.)

"'By subjecting evidence of uncharged sexual misconduct to the weighing process of section 352, the Legislature has ensured that such evidence cannot be used in cases where its probative

22

value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (§ 352.)  This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.'" (*People v. Falsetta* (1999) 21 Cal.4th 903, 917-918 (*Falsetta*).)  The trial court's admission of evidence under these provisions is reviewed for an abuse of discretion.  (See *Erskine*, *supra*, 7 Cal.5th at p. 296; *People v. Kipp* (1998) 18 Cal.4th 349, 369-371.)  We do not disturb that ruling on appeal absent a showing that the court exercised its discretion in an "arbitrary, capricious, or patently absurd manner" that resulted in a "manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Under section 352, "evidence of past sexual offenses proffered under section 1108 requires the court to 'undertake[ ] a careful and specialized inquiry to determine whether the danger of undue prejudice from the propensity evidence substantially outweighs its probative value.'" (*Erskine, supra*, 7 Cal.5th at p. 296, quoting *People v. Merriman* (2014) 60 Cal.4th 1, 41 (*Merriman*).)  Among the factors to consider are the "'nature, relevance, and possible remoteness [of the evidence], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses.'" (*Merriman, supra*, 60 Cal.4th at p. 41, quoting *Falsetta, supra*, 21 Cal.4th at

23

p. 917.)

B.   *Analysis*

Under section 1108, evidence of the crimes against Ashley was admissible to show appellant's propensity to commit the charged sexual offenses against Claudia and Angela, so long as the evidence was not inadmissible under section 352.  As we have discussed, the court relied on the numerous similarities between the Ashley and Claudia offenses and their closeness in time to find that evidence of the uncharged offense was sufficiently probative to justify its admission.  Appellant claims this evidence was  insufficiently probative in light of his admission to the encounter with Claudia and the lack of similarity with the offense involving Angela.  But the evidence of Ashley's kidnapping and rape was relevant under section 1108 to show appellant's propensity to commit the similar offenses against Claudia, and therefore to rebut appellant's defense of consent.

Appellant also asserts that the evidence of the uncharged offenses was highly prejudicial and should have been excluded on that basis.  "Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial. [Citations.]  But Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect.  'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].'  [Citation.]"  (*People v. Quang Minh Tran* (2011) 51 Cal.4th 1040, 1047.)  "In this context, the word 'prejudice' is used in the sense of '"an emotional bias"' or '"of prejudging a person or cause on the basis of extraneous factors."'"  (*People v. Huy Ngoc Nguyen* (2010) 184

24

Cal.App.4th 1096, 1115.)

Appellant reasserts several of his arguments raised elsewhere, including that Ashley was "very emotional, if not hysterical" and "hostile" while testifying, and was allowed to repeatedly testify that she did not remember the key events, the prosecutor then was able to "testify" by "reading a police report into evidence under the guise of questioning Ashley," and the jury was likely confused due to asserted instructional errors. We reject these arguments in Sections V through VII, *post*. In addition, we conclude that appellant has not established that the trial court abused its discretion in determining that the uncharged offenses were not substantially more prejudicial than probative. Appellant cites the upsetting nature of Ashley's testimony, as it involved her rape at gunpoint, and her demeanor on the stand. But the details of her attack came largely through the testimony of police officers, not from Ashley herself. By contrast, Claudia testified in detail regarding her kidnapping and rape. We cannot, on this record, conclude that the trial court abused its discretion in weighing the evidence regarding these attacks against two young women and determining that the uncharged offense was not so highly inflammatory as to require its exclusion.

III. *False Testimony Under Section 1473*

Citing section 1473, appellant argues that his convictions must be overturned because they are based on Ashley's "false" testimony that she could not recall the details of her attack. Section 1473 permits prosecution of a writ of habeas corpus where "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to his or her incarceration."

(§ 1473, subd. (b)(1).) Appellant's contention is meritless, as section 1473 is inapplicable to this direct appeal.

"Ordinarily, a witness's inability to remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.] When, however, 'a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied.'" (*People v. Anderson* (2018) 5 Cal.5th 372, 403, quoting *People v. Rodriguez* (2014) 58 Cal.4th 587, 633 (*Rodriguez*).) Thus, as long as the court has a reasonable basis in the record to conclude that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper under Evidence Code section 1235, the hearsay exception for prior inconsistent statements. (*Rodriguez, supra,* 58 Cal.4th at p. 633.)

Appellant contends that Ashley's testimony that she did not remember in response to most of the questioning at trial was therefore "false" within the meaning of section 1473. But this provision applies to prosecution of a writ of habeas corpus and is therefore inapplicable to appellant's direct appeal. Although he argues he should not have to "jump through a 'habeas corpus hoop,'" appellant fails to provide any authority suggesting that he may bring a section 1473 false evidence claim outside of a habeas corpus proceeding. Thus, we reject his attempt to do so.

IV.    *Constitutional Challenge to Evidence Code Section 1235*

Appellant also contends that Evidence Code section 1235, allowing admission of a witness's prior inconsistent statements, violates his Sixth Amendment right to confront and cross-examine witnesses. This argument has been repeatedly rejected by our Supreme Court. In *Rodriguez, supra,* 58 Cal.4th at p. 632,

26

the defendant challenged the admission of prior statements made by a witness who gave some testimony at trial, but claimed to have no memory of the events she had discussed in her prior statements.  The trial court found the witness was not truthful in testifying that she could not recall and admitted evidence of her prior statements.  (*Ibid*.)  The Supreme Court rejected the defendant's contention that admitting the prior statements violated his right to confront the witness, reasoning that "[t]he United States Supreme Court has made clear that admitting prior statements of a witness who testifies at trial and is subject to cross-examination does not violate a defendant's confrontation rights."  (*Ibid*., citing *California v. Green* (1970) 399 U.S. 149; see also *People v. Anderson*, *supra*, 5 Cal.5th at p. 404 ["In *Crawford v. Washington* (2004) 541 U.S. 36, 59-60, footnote 9, the high court 'reiterate[d] that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.'"]; *People v. Cowan* (2010) 50 Cal.4th 401, 463 ["The Sixth Amendment's confrontation clause does not prohibit admitting into evidence 'testimonial' hearsay statements against a defendant if the declarant appears for cross-examination at trial."].)  We also reject appellant's claim that he was not able to cross-examine Ashley under the circumstances of this case in section V, *post*.

Appellant also contends that "as interpreted by California courts," Evidence Code section 1235 "allows the prosecutor to knowingly elicit 'false' or 'perjured' testimony for purposes of admitting extrajudicial statements," and therefore violates his Sixth Amendment rights.  We rejected this argument in section III, *ante*.

27

**V.**     *Appellant's Ability to Confront Ashley*

Relying on *People v. Murillo* (2014) 231 Cal.App.4th 448 (*Murillo*), appellant contends he was denied his right to a fair trial.  He argues that based on Ashley's conduct and testimony at trial, he was effectively denied his right to confront and cross-examine her as a witness.  We conclude that *Murillo* is distinguishable and find no similar error occurred in this case.

A.     *Factual background*

At the start of her testimony, Ashley confirmed that she did not want to be a witness and was testifying under subpoena.  She testified that she was 14 years old in 2004, living in an apartment on Sepulveda Boulevard, and that on July 13, 2004, she left home to walk to her volunteer job.  The court noted that Ashley was "obviously very upset and emotional right now, and she is crying, and very halting in her testimony."  Ashley testified that she was walking by herself that morning when a vehicle approached her as she passed a middle school.  She testified that she did not remember what time this occurred, the kind of car, or what color it was.  The prosecutor began to ask if reviewing something would refresh her memory, but Ashley cut her off, stating:  "I don't want to see anything. I don't want to be here at all."

When pressed for further details, Ashley continued to respond that she did not know, although she did testify that she was approached by a male, that she went inside the car, spoke to police detectives later that day, and cried as she told her co-workers about what had happened.  At times, the prosecutor asked Ashley to "take a deep breath" and "help me get through this."  Ashley testified that she did not go into the car willingly, but did not know if the man had a weapon.

Defense counsel objected.  At sidebar, defense counsel objected that "this is improper impeachment.  The witness is saying she doesn't remember, she doesn't know.  Obviously, she is very traumatized.  This is cruel, in my opinion," Defense counsel further objected that allowing the prosecutor "to basically read a police report into the record . . . is totally improper. . . .  This is counsel testifying for the police."  The court overruled the objection, stating that "the jury could conclude that they don't believe she doesn't remember, and that it would therefore allow the testimony as "a proper subject for prior inconsistent statement," even though "she is obviously in distress, and I don't want to revictimize her."  The court also noted it would consider striking the testimony as more prejudicial than probative if the prosecution could not present evidence of the similarities between the crimes involving Ashley and Claudia, but that "I don't think we're there yet. . . .  She is being tortured.  She is in a lot of distress.  And I'm going to allow some of it, but at some point we need to put a stop to it."

As the testimony resumed, the court remarked to Ashley that she "seem[ed] a little calmer now," and Ashley agreed.  Ashley continued to respond "I don't know" and "I don't remember" to the prosecutor's questions about the details of the attack.  She also responded several times by asking:  "Why do I have to answer? I don't want to be here."  She did confirm that her attacker raped her.  She also confirmed that she was shown a photographic lineup and confirmed her handwriting on the document.

During cross-examination, Ashley again confirmed that she spoke to the police after the attack, but in response to most of defense counsel's questions, Ashley testified that she did not

remember.  She confirmed that she worked on a drawing with a sketch artist, but did not remember being shown another drawing (done by Claudia) or telling the police that it was not her attacker.  She also testified that she told the police the truth when she spoke to them in 2004, but did not remember what she told them.  She also confirmed that she sustained a conviction for assault with a deadly weapon in 2009.

B.    *Analysis*

The Sixth Amendment right of confrontation "has long been read as securing an adequate opportunity to cross-examine adverse witnesses."  (*United States v. Owens* (1988) 484 U.S. 554, 557 (*Owens*).)  "'[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."'"  (*Id.* at p. 559; see also *Crawford, supra,* 541 U.S. at 60 fn. 9 [the confrontation "[c]lause does not bar the admission of a statement so long as the declarant is present at trial to defend or explain it"].)

A witness who "refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation."  (*People v. Rios* (1985) 163 Cal.App.3d 852, 864, fn. omitted; see also *Murillo, supra,* 231 Cal.App.4th 448, 455–456.)  By contrast, a witness who suffers from memory loss—real or feigned—is considered "subject to cross-examination" because his presence and responses provide the jury with "the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility."  (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420 (*Gunder*) ["The circumstance of feigned memory loss is not parallel to an entire refusal to testify"]; *Owens, supra,* 484 U.S. at

p. 560 ["[W]hen a hearsay declarant is present at trial and subject to unrestricted cross-examination . . . the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness's demeanor satisfy the constitutional requirements."].)

Appellant contends *Murillo, supra*, 231 Cal.App.4th 448 is directly on point. In *Murillo*, the defendant was charged with murdering a rival gang member and shooting two others. (*Id.* at p. 450.) One of the victims, Valencia, identified the defendant as the shooter the day after the shooting, but his identification of the defendant was equivocal. (*Id.* at p. 455.) After Valencia was arrested for an unrelated offense, an investigator promised him leniency if he cooperated with the murder investigation. (*Ibid.*) Valencia then unequivocally identified the defendant as the shooter. (*Ibid.*) At trial, Valencia was called as a witness, but refused to testify and did not invoke his privilege against self-incrimination. (*Id.* at p. 450.) The prosecutor was then allowed to ask him 110 leading questions about his prior statements and to show him the second photographic lineup on which Valencia had identified the defendant. (*Ibid.*) In response, Valencia refused to answer or said he had nothing to say. (*Id.* at p. 451.) As a result, although the jury saw the second lineup with Valencia's writing identifying the defendant, "defense counsel could not elicit testimony on cross-examination about a corresponding suggestion of leniency." (*Id.* at p. 455.)

On appeal, the court noted that "Valencia's out-of-court statements constituted the only eyewitness identification of Murillo and were a crucial link in the proof." (*Murillo, supra*, 231 Cal.App.4th at p. 455.) Under those circumstances, the court concluded that the defendant's "inability to confront Valencia's

31

statements rendered his trial fundamentally unfair.  A prosecutor 'may not, under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony.'" (*Ibid*., quoting *People v. Shipe* (1975) 49 Cal.App.3d 343, 349 [finding a violation of defendant's confrontation right by allowing the prosecutor to ask his codefendants leading questions about their confessions after they invoked the privilege against self-incrimination].)

The *Murillo* court acknowledged that under *Crawford*, when a declarant "'appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.'" (*Murillo, supra*, 231 Cal.App.4th at pp. 455-456, quoting *Crawford, supra*, 541 U.S. at p. 60, fn. 9.) However, the court found that Valencia's "refusal to answer over 100 leading questions while the prosecutor read to the jury from his police interviews denied Murillo the opportunity to cross-examine the victim on what was tantamount to devastating adverse testimony." (*Murillo, supra*, 231 Cal.App.4th at p. 456.) The court reasoned:  "Ordinarily, we assume the jurors follow the trial court's instructions, even when the confrontation clause is implicated. [Citation.]  But there is a point at which the prosecutor's leading questions are tantamount to evidence and overpower the proceedings so that the resulting prejudice is incurable by admonition or instruction.  [Citation.]  Valencia's examination reached that point." (*Id*. at p. 457.)

We find *Murillo* inapplicable here. Unlike the witness in *Murillo* who refused to answer *any* questions, Ashley testified to some of the details surrounding the incident, including confirming that she was forced into the car and that she was raped.  She also answered some questions during cross-

examination. Moreover, although Ashley's prior statements were an important rebuttal to appellant's claim of consent, there was other substantial evidence supporting the convictions here, including testimony by both Angela and Claudia and their identifications of appellant. In addition, the jury heard evidence of Ashley's prior statements through police officer testimony, which appellant had the opportunity to challenge in cross-examination. By contrast, in *Murillo*, the only information regarding Valencia's prior statements came through leading questions posed by the prosecutor.

Under the circumstances, we do not find that Ashley's conduct amounted to a denial of appellant's right to confront her. While "[a]s a practical matter, [Ashley's] claim of total lack of recall limited defendant's ability to cross-examine her about her prior statements . . . this circumstance does not implicate the confrontation clause." (*Rodriguez*, *supra*, 58 Cal.4th at p. 632, citing *Owens, supra*, 484 U.S. at pp. 555–560.) Ashley was present at trial and subjected to cross-examination. Indeed, defense counsel was able to elicit her admission that she previously told police that the sketch prepared by Claudia did not look like her attacker. Her "presence at trial as a testifying witness gave the jury the opportunity to assess her demeanor and whether any credibility should be given to her testimony or her prior statements. This was all the constitutional right to confrontation required." (*Rodriguez*, *supra*, 58 Cal.4th at p. 633, citing *People v. Perez* (2000) 82 Cal.App.4th 760, 766.)

## VI. *Challenge to Jury Instruction Regarding Prior Statements*

Appellant challenges the use of CALCRIM No. 318 to instruct the jury regarding Ashley's prior statements. He argues

that the jury should have been instructed that it could consider Ashley's prior statements for their truth only if it first found that those statements were inconsistent, i.e., if it did not believe Ashley's testimony that she did not recall the incident at issue.

The jury was instructed with CALCRIM No. 226 regarding assessing witness credibility, including: "If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject." The jury was also instructed with CALCRIM No. 318 as follows: "You have heard evidence of statements that a witness made before trial. If you decide that the witness made those statements, you may use those statements in two ways: 1. To evaluate whether the witness's testimony in court is believable; AND 2. As evidence that the information in those earlier statements is true." Appellant argues that these instructions, taken together, failed to tell the jury "how" to use Ashley's prior statements, particularly whether it could consider those statements for their truth only if it believed Ashley's testimony that she did not remember any details.

As an initial matter, respondent contends appellant forfeited this objection. Appellant acknowledges he did not object to the use of either instruction, nor did he request any additional or modified instructions on this issue. However, appellant claims the issue has not been forfeited because jury instructions affecting a defendant's substantial rights are reviewable on appeal without an objection.

"It is well settled that 'a defendant need not object to preserve a challenge to an instruction that incorrectly states the law and affects his or her substantial rights.'" (*People v. Tuggles*

34

(2009) 179 Cal.App.4th 339, 364 (*Tuggles*), quoting *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156; see also Evid. Code, § 1259.)  However, "' a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested an appropriate clarifying or amplifying language.'" (*People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1130, quoting *People v. Hill* (1992) 3 Cal.4th 959, 997; see also *People v. Mackey* (2015) 233 Cal.App.4th 32, 117; *Tuggles, supra*, 179 Cal.App.4th at p. 364.)

Here, appellant does not contend that CALCRIM No. 318 is an incorrect statement of the law regarding a witness's prior statements or that the evidence did not support the giving of the instruction.  Rather, he contends the jury should also have been instructed "how an out-of-court statement could or could not be used."  To preserve the issue, he was required to request the additional language needed to complete or clarify the jury instructions.  The lack of such a request below forfeited the issue for review.  (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142 ["If defendant believed that a modification to [the jury instruction] was required, he was obligated to request it."]; *People v. Spurlock, supra,* 114 Cal.App.4th at p. 1130; *Tuggles, supra,* 179 Cal.App.4th at pp. 364–365.)[5]

---

[5]Appellant notes that the court in *Tuggles, supra*, 179 Cal.App.4th at pp.365-366, recognized "that the instructional issue is nevertheless reviewable because defense counsel's failure to object and request a modification may constitute ineffective assistance of counsel."  But appellant did not raise an ineffective assistance claim here.

35

In any event, we find no instructional error here. Appellant argues that the trial court was required to instruct the jurors that first they had to determine whether they believed Ashley's testimony that she did not remember the details of the incident (and therefore whether her prior statements were inconsistent with her trial testimony). Then, he claims the court should have told the jury that it could consider her prior statements for their truth only *if* it disbelieved Ashley's lack of recall. But whether or not Ashley's statements were inconsistent was an admissibility finding that the trial court implicitly made when it admitted them at trial under the hearsay exception in Evidence Code section 1235. (See *Cottone*, *supra*, 57 Cal.4th 269, 284 ["it is for the trial court to decide questions of law, "'including the admissibility of testimony, [and] the facts preliminary to such admission,'" such as "the admissibility of hearsay evidence under a recognized exception"]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1216, superseded by statute on other grounds as noted in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107; *People v. O'Quinn* (1980) 109 Cal.App.3d 219, 225 [upholding admission where the "trial court's finding that a witness' 'I don't remember' responses are deliberately evasive has a reasonable basis in the record"].) Appellant does not challenge the trial court's factual finding of inconsistency; moreover, he cites no authority in support of his contention that the jury was entitled to reconsider this issue and therefore needed instruction on it.

As such, we find that CALCRIM No. 318 properly instructed the jury that it could use out-of-court statements to evaluate the credibility of a witness's in-court testimony and as evidence that the information in those earlier statements was true. "We decline to impose a sua sponte duty to instruct that the

jury reconsider a fact relating to evidentiary *admission*. Counsel remains free to argue that the evidence does not support the propensity inference." (*Cottone, supra,* 57 Cal.4th 269, 294; see also *People v. Blacksher* (2011) 52 Cal.4th 769, 834–835.)

**VII.** ***Challenge to Jury Instruction Regarding Standard of Proof for Uncharged Offenses***

Appellant contends the trial court erred in instructing the jury that it could consider the evidence of the uncharged offenses if it found by a preponderance of the evidence that appellant committed those offenses. Instead, he argues the correct standard was beyond a reasonable doubt. This contention lacks merit.

As discussed in section I, *ante*, the jury was instructed prior to Ashley's testimony and again at the close of evidence with CALCRIM No. 1191A. That instruction provided in part: "The People presented evidence that the defendant may have committed sex crimes[6] against Ashley [ ]. These crimes are defined for you in these instructions. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely. . . . The People must still prove each charge and

---

[6]In the version given prior to Ashley's testimony, the court identified the uncharged offense as "rape," rather than "sex crimes."

37

allegation beyond a reasonable doubt."

Appellant contends that because evidence of uncharged offenses under section 1108 is "circumstantial evidence," the jury should have been instructed under the "general circumstantial evidence rule" that the prosecution had to prove the uncharged offenses by the higher standard of beyond a reasonable doubt. He relies on *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford*) and *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), but neither case supports appellant's claim.

In *Reliford*, the court considered a challenge to CALJIC No. 2.50.01, the predecessor to CALCRIM Nos. 1191 and 1191A.[7] The version of the instruction, which the court concluded "correctly states the law," told the jury it could consider evidence of prior sexual offenses if it found by a preponderance of the evidence that the defendant committed those offenses. (*Reliford, supra*, 29 Cal.4th at 1009, 1012.) In addition, the court rejected the defendant's argument that "having found the uncharged sex offense true by a preponderance of the evidence, jurors would rely on 'this alone' to convict him of the charged offenses." The court reasoned that "[n]othing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense. . . . The instructions instead explained that, in all other respects, the People had the burden of

_____

[7]CALCRIM No. 1191 was modified in 2017 to distinguish uncharged offenses from charged offenses offered as propensity evidence. CALCRIM No. 1191A now applies to uncharged offenses offered as propensity evidence, while CALCRIM No. 1191B applies to charged offenses offered for that purpose. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 496, fn.1.)

38

proving defendant guilty 'beyond a reasonable doubt.'" (*Id*. at pp. 1013, 1016.)

Likewise, in *Villatoro*, *supra*, 54 Cal.4th at p. 1160, the Supreme Court noted that, "[w]ith regard to the admission of uncharged sexual offenses, we have held that section 1108 satisfies the requirements of due process (*Falsetta*, *supra*, 21 Cal.4th at p. 917), and that CALJIC No. 2.50.01, the predecessor to CALCRIM No. 1191, is a correct statement of the law." The court then considered use of prior *charged* offenses under section 1108 and a modified jury instruction that "clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity." (*Id*. at pp. 1160, 1168.) This discussion is inapplicable to the instant case.

Appellant ignores the discussion in both of these cases affirming the use of the preponderance of evidence standard for uncharged offenses under section 1108. We reject appellant's unsupported contention that the jury was not properly instructed here as to the burden of proof for consideration of the uncharged sex offenses under section 1108.

## VIII. *Challenge to Jury Instruction Regarding Definition of "Sexual Offenses"*

Appellant also challenges the use of CALCRIM No. 1191A because it did not include the definition of "sexual offenses." As such, he claims the jury could have improperly used evidence of uncharged non-sex offenses committed against Ashley to find he had a propensity to commit the charged offenses.

As discussed in section VII, *ante*, the court instructed the jury prior to Ashley's testimony and again at the close of evidence with CALCRIM No. 1191A. The first time, the court identified the uncharged offense as "rape." After the close of evidence, the

court again instructed the jury with CALCRIM No. 1191A, titled "Evidence of Uncharged Sex Offense." The instruction provided in part: "The People presented evidence that the defendant may have committed sex crimes against Ashley [ ]. These crimes are defined for you in these instructions. . . . If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the crimes charged in this case." The court also gave the jury the definitions for rape (CALCRIM No. 1000) and oral copulation (CALCRIM No. 1015).

Appellant argues that the court should have instructed the jury with the definition of "sexual offenses" from section 1108,[8] so that it would understand which crimes could be considered for the purpose of propensity evidence. Because this definition was not given, appellant contends the jury could have believed that the non-qualifying crimes of kidnapping, kidnapping to commit a sex offense, and robbery were "sex crimes." The jury could then have considered the uncharged Ashley kidnapping offenses as "propensity evidence to establish the non-sex charged offenses," an impermissible use of uncharged offenses under section 1108.

"When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a

_____

[8]Section 1108, subdivision (d) defines "sexual offense" to include "[a]ny conduct proscribed by" certain enumerated sections of the Penal Code. There is no dispute here that some of the charged offenses (such as rape and oral copulation), qualified as sexual offenses, while some (such as kidnapping) did not.

40

whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) We "'assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.'" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148–1149, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Here, respondent argues that there was no reasonable likelihood the jury applied the challenged instruction as appellant claims. We agree. CALCRIM No. 1191A expressly instructs jurors that they may consider the defendant's uncharged sex offenses as evidence of that defendant's propensity to commit sex offenses, and therefore as evidence that the defendant committed the sex offenses charged in the case. No reasonable juror would interpret these instructions to include non-sex offenses.

Appellant claims that even if the jury understood that propensity evidence was limited to sex offenses, it had no way to determine which crimes were included in that category. He speculates that the jury therefore reasonably might have decided kidnapping or kidnapping to commit rape were considered sex offenses. When we consider all of the instructions given, we find no reasonable likelihood that the jury misunderstood what constituted a sexual offense. The jury was given several other instructions that referred to "sex offenses" and specified that those offenses included rape and oral copulation. For example, the jury was given CALCRIM Nos. 3175 and 3179, which told the jury that if it found appellant guilty of the "sex offenses" in counts four through eight, it must consider the kidnapping

41

enhancement allegation for those counts. As such, the jury was instructed that the applicable "sex offenses" were those in counts four through eight—the counts charging rape and oral copulation. Similarly, in the instruction on count three, CALCRIM No. 1203, the charge was listed "kidnapping: for rape, or other sex offenses," and described in the instruction as "kidnapping for the purpose of rape or oral copulation." In addition, in her closing argument, the prosecutor described count one as "assault likely to commit another felony, that being a sex crime such as rape or sexual penetration." We therefore reject appellant's argument that the jury could have improperly used uncharged non-sex offenses as propensity evidence under section 1108.

**Issues 9-13: Challenges to Count One Conviction (Assault of Angela)**

IX. *Existence of Crime Charged Under Section 220*

Appellant was convicted in count one of assaulting Angela with the intent to commit rape or sexual penetration, in violation of section 220. He contends that section 220 contemplates two separate crimes—assault with intent to commit rape and assault with intent to commit sexual penetration by a foreign object. Thus, he argues that his conviction must be reversed because he was charged with a combined crime that "does not exist." We are not persuaded.

Section 220, subdivision (a)(1) provides: "any person who assaults another with intent to commit mayhem, rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289 shall be punished. . . ." Both the information and the amended information charged appellant in count one with an "assault with intent to commit a felony in violation of section 220," and further alleged that appellant had the "intent to commit rape, sodomy,

oral copulation and a violation of sections 264.1, 288 and 289." Section 289 prohibits forcible sexual penetration.

The court instructed the jury with CALCRIM No. 890, entitled "Assault with intent to commit specified crimes." The instruction provided: "The defendant is charged in Count 1 with assault with intent to commit rape," which required proof, among other elements, that "[w]hen the defendant acted, he intended to commit rape or sexual penetration." The instruction also stated: "To decide whether the defendant intended to commit rape or sexual penetration, please refer to the instructions defining those crimes." The jury was also given CALCRIM No. 1000 for rape and CALCRIM No. 1045 for sexual penetration, defined as "penetration, however slight," with a "foreign object," including "any part of the body except a sexual organ." Using the verdict form for count one, the jury found appellant guilty of "assault with intent to commit a felony" for assaulting Angela, "with the intent to commit a rape, or sexual penetration, in violation of section 220, a felony, as charged in Count 1 of the information."

Appellant contends that section 220 includes "several separate and distinct crimes based on specific intent to commit a specified felony." As such, he argues that he was convicted of the nonexistent crime of assault with intent to commit rape *or* sexual penetration. Respondent counters that section 220, subdivision (a)(1) defines a single crime—assault with intent to commit the specified sex offenses. One of the elements of that crime is the specific intent to commit the underlying sex offense.

Both parties cite to *People v. Davis* (1995) 10 Cal.4th 463 (*Davis*). In *Davis*, the defendant was charged with and convicted of a count of assault "with intent to commit rape and/or sodomy" in violation of section 220. *Id*. at pp. 487-488.) In affirming the

43

conviction, the court found: "'The essential element of [assault with intent to commit rape] is the intent to commit the act against the will of the complainant. The offense is complete if at any moment during the assault the accused intends to use whatever force may be required.' [Citation.] The same, we believe, is true of assault with intent to commit sodomy." (*Id.* at p. 509, quoting *People v. Meichtry* (1951) 37 Cal.2d 385, 388-389.) The court concluded there was "substantial evidence from which a rational trier of fact could infer intent to commit rape and/or sodomy." (*Id.* at p. 510.)

We agree with respondent that *Davis* supports appellant's conviction here. Notably, although the *Davis* court did not otherwise discuss the propriety of the wording of the assault charge, the decision affirmed a single charge alleging an intent to commit one sex offense "and/or" another. Respondent also points to the court's reference to the intent to commit a specified sex offense as an element of the crime. Similarly, here, the charge at issue alleged that appellant committed the assault with the intent to commit rape or sexual penetration.

Although appellant contends this was improper, he cites no authority on point. None of the cases cited by appellant involves a similar question where a single charge alleges a violation of section 220 with the intent to commit one of two underlying offenses. (See *People v. De Porceri* (2003) 106 Cal.App.4th 60, 63 [discussing whether a prior conviction of assault with intent to commit lewd touching under section 220 qualifies as a strike]; *People v. Jernigan* (2014) 227 Cal.App.4th 1198, 1204 [whether prior conviction for attempted forcible oral copulation disqualified defendant from seeking resentencing under section 1170.126]; *People v. Puckett* (1975) 44 Cal.App.3d 607, 611[discussing the

44

definition of "rape" as used in section 220]; *People v. Meichtry, supra,* 37 Cal.2d at p. 387 [reviewing sufficiency of the evidence for conviction of assault with intent to commit rape].) Nor has appellant cited any authority rejecting such a charge. As such, we find no error.

## X.    *Amendment of Count One*

Appellant also contends that the trial court erred in allowing the prosecution to amend count one to include an intent to commit sexual penetration. We find no evidence in the record that such an amendment was made and therefore affirm.

As detailed in section IX, *ante*, the information filed in 2017 and the amended information filed in 2018 charged appellant in count one with an "assault with intent to commit a felony in violation of section 220," and further alleged that appellant had the "intent to commit rape, sodomy, oral copulation and a violation of sections 264.1, 288 and 289." At a conference during trial, the prosecutor sought to amend the information a second time to conform the enhancement allegations to proof. The court granted the amendment, and both the prosecutor and the court confirmed that the amended information made no changes to the charges, but only to the sentencing enhancements under section 667.61.

At the same conference, the court and the parties also discussed the jury instructions. The prosecution requested a modification of CALCRIM No. 890, which explains the elements of section 220, as charged in count one. The request was to revise element five to state that appellant acted with intent to commit "rape *or sexual penetration*," instead of only "an intent to commit rape." Defense counsel objected, noting that the next instruction "defines rape as any penetration. And I think that's

45

enough." When the court inquired about the purpose for the addition, the prosecutor stated she planned to argue that if appellant's intent was not specifically to commit rape, it was to commit sexual penetration by foreign object. Defense counsel objected that there was no evidence of such intent and the instruction could confuse the jury. The court responded: "The evidence was he grabbed her and pulled her pants down. So I think you could argue either way." The court also noted that "a foreign object can be a finger as well. So if this is the People's theory of count 1 with Angela, there is substantial evidence to argue it."

Appellant argues that there was insufficient evidence from the preliminary hearing to support the amendment and therefore it was error for the court to allow "the prosecutor to amend the information to specifically allege 'with intent to commit sexual penetration.'" However, he has failed to show that the information was ever amended in the manner he claims. Instead, his record citations reflect the discussion over the prosecutor's request to modify the jury instructions. As such, appellant's claim of error regarding amendment of the information fails.[9] We

_____

[9]In his reply, appellant also argues that even if the information was not amended as he claims, count one of the original information was not supported by substantial evidence from the preliminary hearing. This claim, along with the attendant ineffective assistance claim, is raised for the first time in reply. We therefore do not consider either argument. (See, e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26 ["'[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.'"].)

46

also note that an intent to commit sexual penetration was already alleged in the information as an intent to commit a violation of section 289.  Therefore, there would have been no need to amend the information to include it at trial.

Appellant also challenges the sufficiency of the evidence at trial to support a jury instruction and/or a conviction on count one based on a finding that he had the intent to commit sexual penetration with a foreign object.  We discuss that claim in section XII, *post*.

## XI.  *Jury Instruction on Unanimity*

Continuing his argument from section IX that count one charged two separate crimes—assault with intent to commit rape and assault with intent to commit sexual penetration—appellant further contends the jury should have been instructed with unanimity principles as to that count.  We disagree.

"In a criminal case, 'the jury must agree unanimously the defendant is guilty of a *specific* crime.  [Citation.]  Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.'  [Citation.]  Yet 'where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the "theory" whereby the defendant is guilty.'"  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877-878 (*Covarrubias*), quoting *People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  Where required, a unanimity instruction must be given sua sponte.  (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 274–275.)

Appellant's contention that a unanimity instruction was required here rests on his claim that count one charged two separate crimes. We rejected this argument in section IX, *ante*. Notably, appellant does not suggest that the prosecution alleged two discrete acts of assault. Rather, he claims that the single act of assault committed with either the intent to commit rape or the intent to commit sexual penetration required an instruction to the jury that it must "unanimously agree[ ] as to the mens rea necessary [to] establish a *particular* crime." The cases he cites do not support this contention; rather, they required a unanimity instruction where multiple *acts* were alleged. (See *Covarrubias, supra*, 1 Cal.5th at pp. 877–878; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 571 ["[T]he evidence in this case was not indicative of one discrete act. Rather, the record reveals two discrete acts of possession, either of which could have constituted the charged offenses."]; see also *People v. Quiroz* (2013) 215 Cal.App.4th 65, 73 ["Unanimity is not required" where the defendant committed only one discrete criminal event "even if the jurors might conclude that the defendant is guilty based on different facts, or on different findings about the acts the defendant committed or his mental state."].)

Moreover, even if evidence of two separate assault crimes was presented, no unanimity instruction was required because appellant presented the same defense to both crimes. Specifically, he claimed that he was not Angela's assailant. Thus, "the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed defendant committed one act but disbelieved that he committed the other, or because 'there was no evidence . . . from which the jury could have found defendant was guilty of' the crime based on one act

but not the other." (*Covarrubias, supra,* 1 Cal.5th at pp. 879–880, quoting *People v. Davis* (2005) 36 Cal.4th 510, 562; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1199 [unanimity instruction was not required on the robbery charge because the defense as to each act of robbery was that the defendant did not participate in the robbery].)

## XII. *Sufficiency of the Evidence on Count One*

Appellant also contends that his conviction on count one for assault with intent to commit rape or sexual penetration should be reduced to simple assault because there was insufficient evidence that he assaulted Angela with the intent to commit a sexual offense.

### A. Governing Principles

When considering a claim of insufficient evidence, we review the entirety of the record to determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Hoyt* (2020) 8 Cal.5th 892, 949-950.) The evidence in the record must be substantial, that is, reasonable in nature, credible, and of solid value. (*Id.* at p. 950.) We "'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)

An assault with intent to commit rape requires an intent to have sexual intercourse, and to use force to overcome the victim's resistance. (*People v. Craig* (1994) 25 Cal.App.4th 1593, 1597 (*Craig*).) The crime is complete if at "'any moment during the assault the accused intends to use whatever force may be required'" to have sexual intercourse or sexually penetrate the victim. (*People v. Davis, supra,* 10 Cal.4th 463, 509; see also

49

§ 289, subd. (k) [Penetration requires "causing the penetration, however slight, of the genital or anal opening of any person" by "any foreign object"].)

"Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) "'The specific intent with which an act is done may be shown by a defendant's statement of his intent and by the circumstances surrounding the commission of the act.'" (*Craig, supra,* 25 Cal.App.4th at p. 1597, quoting *People v. Duke* (1985) 174 Cal.App.3d 296, 300.) "The question whether the intent existed is one for the jury to determine from the conduct of the defendant and the surrounding circumstances." (*People v. Meitry, supra*, 37 Cal.2d at p. 389.)

B. Analysis

Appellant concedes that the evidence was sufficient to support a conviction for assault, but argues that there was insufficient evidence to allow the jury to conclude that he had the specific intent to commit rape at the time. He points to the evidence at trial that Angela's attacker pulled down her pants, without saying a word and without further incident. He contends that this evidence was "equivocal" and could support a mere "pantsing" lacking any felonious intent. He further suggests that the conduct here "is far more innocuous" than the conduct in *People v. Greene* (1973) 34 Cal.App.3d 622. We disagree.

In *Greene*, the victim testified that the defendant approached her while she was walking, put his arm around her waist, and turned her around. (*People v. Greene, supra*, 34 Cal.App.3d at p. 650.) He said, "Don't be afraid. I have a gun. Don't move." At his request, the victim placed her arm around

50

his waist and they started walking. (*Ibid*.) The defendant also told her, "I just want to play with you," and moved his hand slightly up and down her waistline. (*Ibid*.) He "did not attempt to disarrange her apparel." (*Ibid*.) After they had walked past several houses, the victim managed to break free and run to safety. (*Ibid*.) On appeal, the court concluded there was insufficient evidence to support a finding of assault with intent to rape. (*Id*. at p. 653.) In support of this conclusion, the court cited the facts of several cases in which the People had presented stronger evidence of the defendant's intent. (*Id*. at pp. 651–652.)

*Greene* is inapposite. To begin with, the *Greene* court's reasoning was based primarily on its assessment that the evidence in that case was weaker than that presented in other cases. However, the Supreme Court has cautioned against such an approach to evaluating sufficiency claims. (See *People v. Story* (2009) 45 Cal.4th 1282, 1299 ["The Court of Appeal erred in focusing on evidence that did not exist rather than on the evidence that did exist."]; see also *People v. Thomas* (1992) 2 Cal.4th 489, 516 ["When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts."].) We therefore do not find *Greene* persuasive.

Further, the evidence and reasonable inferences flowing therefrom are stronger in this case than in *Greene*. Here, appellant forcefully grabbed Angela from behind with both arms as if to bring her to the ground, then pulled her pants down to mid-thigh, exposing her bare bottom. The assault ended when Angela knocked appellant down and ran away. Angela testified that she thought appellant intended to rape her, and she told the 911 operator that her assailant tried to rape her. In addition, the

jury heard evidence that appellant raped Ashley, from which it could infer appellant's propensity to commit sexual offenses. Appellant's attack on Ashley offers strong support for the finding that he intended to do more than grab Angela or pull down her pants. "While other reasonable inferences also might be drawn, it was for the jury, not us, to draw them." (*Craig, supra*, 25 Cal.App.4th at p. 1604.) We conclude that the conviction was supported by substantial evidence.

We also reject appellant's challenge to his assault conviction as lacking sufficient evidence of an intent to commit sexual penetration. Even assuming there was insufficient evidence of such an intent, it would not compel reversal where, as here, we have concluded that there was sufficient evidence to support an intent to commit rape and there is no showing that the jury relied on an inadequate ground. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 ["If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground."].)

## XIII. *Jury Instruction on Lesser Included Offense of Assault (Count One)*

In his final challenge to count one, appellant argues that the court erred by failing to instruct the jury on the lesser included offense of assault. We find no error and further find that any error was harmless.

### A.     Governing Principles

"[A] trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, ... whenever there is substantial evidence raising a question as to

52

whether all of the elements of the charged greater offense are present.  [Citations.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 215.)  "[T]his does not mean that the trial court must instruct sua sponte on the panoply of all possible lesser included offenses.  Rather, . . .'such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.'" (*Ibid.*; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)  In this context, "the 'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely 'any evidence . . . no matter how weak' [citation], but rather "'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'" that the lesser offense, but not the greater, was committed." (*People v. Cruz* (2008) 44 Cal.4th 636, 664, quoting *People v. Carr* (1972) 8 Cal.3d 287, 294.)

On appeal, "[w]e review the trial court's failure to instruct on a lesser included offense de novo considering the evidence in the light most favorable to the defendant." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30; see also *People v. Souza* (2012) 54 Cal.4th 90, 113.)

B.    Analysis

Respondent concedes that simple assault is a lesser included offense of assault with intent to commit a rape or sexual penetration.  (See, e.g., *People v. Elam* (2001) 91 Cal.App.4th 298, 308.) But respondent argues that no instruction was necessary here because appellant denied any involvement in the assault, citing a line of cases holding that "when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense." (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709; see also *People v. Chestra* (2017)

53

9 Cal.App.5th 1116, 1123 (*Chestra*); *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1021-1022.)

In *Chestra*, *supra*, 9 Cal.App.5th at p. 1119, the defendant, charged with murder, testified at trial that someone else shot the victim. However, the prosecution presented evidence that the defendant previously admitted to the police and in a letter to his wife that he intentionally shot the victim. (*Ibid*.) On appeal, the defendant contended that the trial court was required to instruct the jury sua sponte on voluntary manslaughter based on heat of passion and imperfect self-defense, both lesser included offenses of murder, citing evidence that he had argued with the victim. (*Id* at p. 1120.)

The appellate court noted that "the trial court must instruct on a lesser included offense supported by the evidence even when it is inconsistent with the defendant's chosen defense." (*Chestra*, *supra*, 9 Cal.App.5th at p. 1121, citing *Breverman, supra*, 19 Cal.4th at pp. 157.) However, the court concluded there was no error, reasoning that "[u]nder no view of the evidence was defendant guilty of only voluntary manslaughter. Defendant's trial testimony would not permit a jury composed of reasonable persons to conclude he was guilty of voluntary manslaughter but not murder, nor would his confession . . . [, which] did not indicate the fatal shooting occurred in the heat of passion or imperfect self-defense." (*Chestra, supra*, 9 Cal.App.5th at p. 1123.) Thus, the court found that "[t]he evidence was such that defendant was either guilty of murder or not guilty of any offense." (*Ibid*.; see also *People v. Sinclair, supra*, 64 Cal.App.4th at pp. 1021-1022 ["When defendant denied he shot the decedent, none of the alleged evidence of heat of passion and imperfect self-defense was of the type 'that a reasonable jury could find

54

persuasive.' [Citation.] Simply stated, the duty to instruct on inconsistent defenses does not extend to cases such as this where the sworn testimony of the accused completely obviates any basis for finding a lesser included offense."].)

We reject appellant's assertion that *People v. Barton* (1995) 12 Cal.4th 186 (*Barton*) is at odds with *Chestra* and similar cases and compels a different result. In *Barton*, the defendant in a murder trial objected to the court instructing the jury on voluntary manslaughter, arguing that it did not fit the theory of the case presented by either party. (*Id*. at p. 193.) Our Supreme Court concluded that the trial court had not erred, because the record contained substantial evidence to support a conviction for voluntary manslaughter. (*Id*. at p. 202.) As such, "[t]he trial court must instruct on lesser included offenses when there is substantial evidence to support the instruction, regardless of the theories of the case proffered by the parties. Here, . . . the evidence supported an instruction on voluntary manslaughter as a lesser included offense, notwithstanding the arguments of the prosecution and defense." (*Ibid*.)

The *Barton* court also recognized that no instruction was necessary where "the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime," because "in such a case 'there is no evidence that the offense was less than that charged.'" (*Barton, supra*, 12 Cal. 4th at p. 196, fn. 5; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 423 [finding no error in failure to instruct on lesser included offense where "there was no evidence from which a jury composed of reasonable individuals could have concluded that he committed that crime. He was either guilty of the charged crime or not guilty at all."]; *People v. Sinclair, supra*, 64 Cal.App.4th at p. 1021

[distinguishing *Barton* as a case where the defendant admitted shooting the victim but denied intent to kill, thus "there was a basis for heat of passion and imperfect-self defense instructions"].)

Applying these principles, we conclude that the court did not err in failing to instruct the jury regarding assault. Appellant denied being at the park or interacting with Angela in any way.  Conversely, Angela testified that he grabbed her from behind with both arms and then pulled down her pants. Appellant's forceful attempt to bring Angela to the ground and remove her clothing, coupled with the propensity evidence regarding his rape of Ashley a few weeks later, support the inference that he intended to commit a sexual offense. Appellant's use of force was such that Angela testified that she thought he was going to rape her, and she told the 911 operator that he "tried" to do so.  Thus, appellant's denial of any complicity in the assault "lays no foundation for any verdict intermediate between 'not guilty' and 'guilty as charged.'"  (*People v.* (1993) 16 Cal.App.4th 1255, 1260, quoting *People v. Morrison* (1964) 228 Cal.App.2d 707, 712- 713; see also *People v. Salas* (1978) 77 Cal.App.3d 600, 608 [no obligation to instruct on lesser included offense of assault where defendant's only defense to robbery charge was "that of alibi"].)  Thus, neither the evidence adduced by appellant nor by the prosecution established that appellant committed assault but not assault with the intent to commit rape or sexual penetration to an extent that was "substantial enough to merit consideration" by the jury.  (*People v. Huggins, supra,* 38 Cal.4th at p. 215.)

Moreover, even assuming the trial court erred, we find the error harmless.  We review an erroneous failure to instruct on a

lesser included offense for prejudice under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818.  (See *Breverman, supra*, 19 Cal.4th at p. 178.)  Under that standard, a conviction may be reversed only if, "'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred."  (*Breverman, supra*, at p. 178.)  Given appellant's denial that he was involved in Angela's attack, as well as the evidence outlined above, it is not reasonably probable that the jury would have concluded he assaulted Angela, but did so without the necessary intent to commit a sexual offense.

**Issues 14-16: Challenges Regarding Lesser Included Offenses**

**XIV.** ***Jury Instruction on Lesser Included Offense of False Imprisonment (Counts Two and Three)***

Appellant asserts that his convictions for simple kidnapping  in count two (§ 207, subd. (a)) and kidnapping to commit rape in count three (i.e., aggravated kidnapping; § 209, subd. (b)(1)) involving Claudia must be reversed because the trial court did not instruct the jury on the lesser included offenses of false imprisonment and forcible false imprisonment (§§ 236, 237). We find no such instruction was required.

False imprisonment and forcible false imprisonment are lesser included offenses of kidnapping and aggravated kidnapping.  (See *People v. Magana* (1991) 230 Cal.App.3d 1117; *People v. Jandres* (2014) 226 Cal.App.4th 340, 362.)  But a lesser included offense instruction on false imprisonment is not required where the evidence establishes that defendant was either guilty of kidnapping or was not guilty at all.  (See *Barton,*

57

*supra*, 12 Cal.4th at p. 196, fn. 5; *People v. Kelly* (1990) 51 Cal.3d 931, 959; *People v. Leach* (1985) 41 Cal.3d 92.)

False imprisonment is the unlawful violation of the personal liberty of another. (§ 236.) Simple kidnapping under section 207 requires proof that: "(1) the defendant took, held, or detained another person by using force or by instilling reasonable fear; (2) using that force or fear, the defendant moved the other person, or made the other person move a substantial distance; and (3) the other person did not consent to the movement." (*People v. Hoyt, supra*, 8 Cal.5th 892, 923, citing § 207, subd. (a).) A kidnapping to commit rape under section 209 occurs when "Any person . . . kidnaps or carries away any individual to commit . . . rape, [or] oral copulation. . . .  [¶] This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."  (§ 209, subd. (b).)

Accordingly, the parties focus on the requirement of "substantial" movement as the differentiating factor between kidnapping (and/or aggravated kidnapping) and false imprisonment.  Appellant contends the evidence of kidnapping Claudia involved two movements—first, from the street into the car, and second, driving the car into the alley.  He argues that the jury could reasonably find that one or both of these movements constituted only false imprisonment, and not kidnapping, because it could conclude that the movement distance was "trivial."

We disagree.  There was no evidence to support a false imprisonment instruction at either point during the incident. Claudia testified that after appellant put his gun to her head, he moved her about six feet from the sidewalk into the front

58

passenger seat of his car. In determining whether the offense met the requirement for movement of the victim, the jury must consider "the 'scope and nature' of the movement. This includes the actual distance a victim is moved. However, we have observed that there is no minimum number of feet a defendant must move a victim in order to satisfy" this requirement. (*People v. Rayford* (1994) 9 Cal.4th 1, 12; see also *People v. Jones* (1999) 75 Cal.App.4th 616, 628–629.)

For example, in *People v. Shadden* (2001) 93 Cal.App.4th 164 (*Shadden*), the court affirmed a conviction of kidnapping to commit rape where the defendant moved the victim nine feet from the front of a store to a back room, finding that the movement was substantial and increased victim's risk of harm. (*Id.* at p. 169.) The court reasoned that "[w]here movement changes the victim's environment, it does not have to be great in distance to be substantial." (*Ibid.*, citing *People v. Smith* (1995) 33 Cal.App.4th 1586, 1593-1594 [defendant moved the victim from the driveway into a camper at the rear of the house].) Further, where a defendant moves a victim from a public area to a place out of public view, the risk of harm is increased even if the distance is short. (*Shadden, supra*, 93 Cal.App.4th at p. 169 [listing cases where the defendant "secluded or confined the victim"]; *People v. Smith, supra*, 33 Cal.App.4th at p. 1594; *People v. Diaz, supra*, 78 Cal.App.4th at p. 249 [where the defendant moved the victim from a well-lit area to the back of a recreation center, "the risk to the victim in the dark isolated location of the attack increased significantly as compared to the lighted sidewalk . . . where the incident began"]; *People v. Jones, supra*, 75 Cal.App.4th at p. 630 [asportation requirement met where the defendant moved the victim across a parking lot and into a car].)

Here, appellant's movement of Claudia from the sidewalk into the car substantially changed her environment and subjected her to an increased risk of harm by putting her into a car with her armed assailant. Under these circumstances, there was no evidence from which the jury could reasonably have found that appellant imprisoned Claudia but did not kidnap her. Nor did appellant's defense provide any support for an instruction on false imprisonment, as he testified that Claudia got into the car willingly and denied having a gun. As such, appellant's "conduct either went beyond the mere violation of [Claudia's] personal liberty, or it was not culpable," (*People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1233), and no instruction on lesser included offenses was warranted.[10]

## XV. *Count Two as a Lesser Included Offense to Count Three*

Appellant also urges reversal of the conviction for simple kidnapping of Claudia on count two, arguing that it was a lesser included offense of his conviction for aggravated kidnapping of Claudia on count three, and he could not be convicted of both. We agree.

---

[10]Appellant acknowledges that if the jury properly found evidence supporting a kidnapping at the time Claudia was forced into the car, that crime continued until appellant released her. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1159 (*Barnett*) [finding that once the forcible movement of a person commences, the kidnapping is ongoing and continues "until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety. . . ."].) Thus, there would be no basis for an instruction on false imprisonment from the subsequent movement of the car into the alley.

Respondent acknowledges that appellant cannot be convicted of both aggravated kidnapping and the lesser included offense of simple kidnapping based upon the same conduct. (See *People v. Ortega* (1998) 19 Cal.4th 686, 694, 699.) But respondent argues that the two kidnapping convictions were "not based on the same conduct," but rather on the two movements of Claudia from the street to the car and then into the alley.

Respondent's contention lacks merit. Kidnapping is a continuing offense: once the forcible movement of a person commences, the kidnapping is ongoing "until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety." (*Barnett, supra,* 17 Cal.4th, at p. 1159; see also *Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 408 ["as long as the detention continues, the crime continues"].) Thus, Claudia's kidnapping was continuous and cannot be subdivided as to permit multiple convictions as respondent suggests. (See *People v. Jackson* (1998) 66 Cal.App.4th 182, 190 [rejecting argument that the defendant's first act of forcing victim into her car was simple kidnapping, followed by second act of aggravated kidnapping]; *People v. Thomas* (1994) 26 Cal.App.4th 1328, 1335.) Notably, none of respondent's cited cases involves kidnapping. (See *People v. Whitmer* (2014) 59 Cal.4th 733, 740 [theft]; *People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474-1477 [spousal abuse].). We therefore reverse the conviction on count two.

## XVI. *Jury Instruction on Lesser Included Offense of Theft (Count Nine)*

Appellant also urges the reversal of his conviction for the robbery on count nine, involving the taking of Claudia's purse. He contends that the trial court erred in failing to instruct the

jury on the lesser included offenses of grand theft person and theft. We affirm.

Robbery involves taking property from another by means of force or fear. (*People v. Holt* (1997) 15 Cal.4th 619, 671, 690 (*Holt*); § 211.) "Fear may be inferred from the circumstances in which a crime is committed or property is taken." (*Holt, supra*, 15 Cal.4th at p. 690.)

"To support a robbery conviction, the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force." (*People v. Marshall* (1997) 15 Cal.4th 1, 34.) "[I]f the intent arose only after the use of force against the victim, the taking will at most constitute a theft." (*Ibid*.) Where a defendant begins a sexual assault, aware that the victim has property and takes it, the jury may infer the defendant intended to commit both rape and robbery. (*Shadden, supra*, 93 Cal.App.4th at p. 170, citing *Holt, supra*, 15 Cal.4th at p. 671.) Or it may infer that the force used for the sexual offense was also force for robbery. (*Shadden, supra*, 93 Cal.App.4th at p. 170, citing *Holt, supra*, 15 Cal.4th at p. 671; see also *People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. 8 ["In order to support a robbery conviction, the taking, either the gaining possession or the carrying away, must be accomplished by force or fear."].)

Appellant argues that there was evidence from which the jury could infer that he did not form the intent to steal Claudia's purse until after he used force against her. We are not persuaded. Claudia testified that after appellant allowed her to get out of the car, he told her she was lucky he let her live, then refused her request to return her purse and drove away. On the other hand, in appellant's testimony at trial, he admitted taking Claudia's purse, but claimed he did not know it was in the car

62

until he had driven away and did not know of its contents, including Claudia's cell phone, until later when his friends went through the purse. Thus, the prosecution's evidence supported a finding of robbery, while appellant's testimony, if believed, would support the inference that he did not intend to take Claudia's purse. Claudia's testimony did not support appellant's argument that he had ceased his use of force or fear against Claudia at the time he decided to take her purse, such as would support an instruction for theft. The jury was entitled to credit Claudia's evidence, and obviously did so.

**Issues 17-25: Enhancement and Sentencing Challenges; Request for In Camera Review**

**XVII.** *Jury Instruction on One Strike Aggravated Kidnapping Circumstance*

For the sex offenses involving Claudia (counts four through seven), the jury found true the aggravated kidnapping circumstance under the One Strike law (§ 667, subd. (d)(2)). Appellant contends that these findings must be reversed because the jury was not adequately instructed. We affirm.

A.      One Strike kidnapping circumstance

The One Strike law, section 667.61, "ensures serious sexual offenders receive long prison sentences whether or not they have any prior convictions." (*People v. Wutzke* (2002) 28 Cal.4th 923, 929.) Section 667.61 creates an alternative, harsher sentencing scheme of either 15 or 25 years to life for certain enumerated sex offenses accompanied by additional specified factual findings. (§ 667.61; see *People v. Mancebo* (2002) 27 Cal.4th 735, 738.)

The version of section 667.61, subdivision (a) applicable to appellant's convictions provided, in relevant part: "A person who is convicted of an offense specified in subdivision (c) under one or

63

more of the circumstances specified in subdivision (d) . . . shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 25 years." (Added by Stats.1994, 1st Ex.Sess.1994, ch. 14, § 1, p. 8570.) Here, appellant was convicted in counts four through seven of forcible rape and forcible oral copulation, both offenses included in the list of qualifying One Strike crimes. (§ 667.61, subd. (c)(1) [rape, counts four, five, and seven], (c)(6) [oral copulation, count six].). The aggravating circumstance at issue here is the kidnapping circumstance under subdivision (d)(2), which provides: "The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)."

The court instructed the jury with CALCRIM No. 3175 as follows: "If you find the defendant guilty of the crimes charged in Counts 4, 5, 6, 7 and 8, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant kidnapped Claudia [ ], increasing the risk of harm to her, [¶]. . . . To prove this allegation, the People must prove that: [¶] . . . 2. Using that force or fear, the defendant moved Claudia [ ] or made her move a substantial distance; [¶] 3. The movement of Claudia [ ] substantially increased the risk of harm to her beyond that necessarily present in the rape and oral copulation; [¶] . . . In deciding whether the distance was substantial and whether the movement substantially increased the risk of harm, you must consider all the circumstances relating to the movement."

The jury found true the aggravated kidnapping circumstance allegations for counts four through seven. For the

64

same counts, the jury also found true a simple kidnapping circumstance under section 667.61, subdivision (e)(1).  The latter circumstance triggers a shorter One Strike sentence of 15 years to life and is not at issue here.

B.     Analysis

Appellant contends that in addition to CALCRIM No. 3175, the jury should have been instructed that (1) the underlying offenses of rape and oral copulation were inherently dangerous to human life; and (2) the jury was required to consider whether appellant's movement of Claudia substantially increased the risk of harm to her beyond the risk, in the *abstract*, present in rape and oral copulation.[11]

"Jury instructions must be read together and understood in context as presented to the jury.  Whether a jury has been correctly instructed depends upon the entire charge of the court." (*People v. Tatman* (1993) 20 Cal.App.4th 1, 10.)  "Jurors are presumed to be intelligent persons capable of understanding and correlating jury instructions." (*People v. Brock* (2006) 143 Cal.App.4th 1266, 1277.)  In evaluating instructions, the question is whether there is a reasonable likelihood that the jury misunderstood the charge.  (*People v. Kelly* (1992) 1 Cal.4th 495, 525.)

We find no instructional error here.  Appellant's first contention is that the jury should have been instructed that the crimes of rape and oral copulation are "inherently dangerous to human life."  He relies on authorities setting forth the proposition

---

[11]Because appellant contends that the jury instruction misstated the law, we reject respondent's forfeiture claim.  (See *Tuggles, supra*, 179 Cal.App.4th 339, 364.)

that rape and oral copulation are considered felonies inherently dangerous to human life for the purpose of the felony-murder rule. None of these authorities apply this principle to a kidnapping enhancement under section 667.61, nor do they discuss the necessity of explicitly instructing the jury as to inherent dangerousness. (See *People v. Coleman* (1989) 48 Cal.3d 112,138 [reciting instruction]; *People v. Haley* (2004) 34 Cal.4th 283, 314, fn. 12 [same]; § 189, subd. (a) [listing underlying crimes for charge of felony murder].) In any event, we find no reasonable likelihood that jurors were misled under the instructions here. They were instructed to consider, based on the totality of the circumstances, the level of risk of harm present in the underlying offenses of forcible rape and oral copulation, and then to determine whether appellant's movement of Claudia substantially increased the risk of harm to her beyond that baseline level of risk. It is unlikely that the jury believed that there was little to no risk of harm to Claudia from forcible sexual offenses, or that those offenses posed no inherent danger to her life.

Appellant also contends that in order to find a substantial increase in risk, the jury was required to determine the baseline level of risk inherent in the underlying sex offenses in the abstract, rather than by examining his specific conduct in the charged offenses. As such, appellant contends that the language "necessarily present in the rape" from the jury instruction "unlawfully allowed the jury to rely upon defendant's specific rape or oral copulation instead of the inherent nature of these crimes." Apart from citing the use of the word "inherent" in section 667.61, subdivision (d)(2), appellant does not provide any authority for this claim. Moreover, his suggestion is at odds with

the instruction's charge that "[i]n deciding whether the distance was substantial and whether the movement substantially increased the risk of harm, you must consider all the circumstances relating to the movement."  Nor does he explain the purported harm to him from the jury's examination of the level of risk inherent in his sex offenses compared to the level of risk in an abstract rape or oral copulation.  We therefore reject this claim of error.

Additionally, we conclude that any failure to properly instruct on the increased risk of harm element of the section 667.61 kidnapping qualifying circumstance was harmless beyond a reasonable doubt.  (See *People v. Luna* (2012) 209 Cal.App.4th 460, 468 [§ 667.61, subd. (e)(1) kidnapping qualifying circumstance]; *People v. Jones* (1997) 58 Cal.App.4th 693, 715–716 [§ 667.61, subd. (d)(2) aggravated kidnapping].)  In convicting appellant of aggravated kidnapping in count three, the jurors were required to find that appellant's movement of Claudia increased her risk of harm above the risk inherent in the underlying offenses.

The only potential ground for error here, therefore, is related to the requirement under section 667.61 that the increase in the risk of harm be "substantial."  However, the substantial risk of harm issue was uncontested.  The omission of an element during jury instruction may be harmless when the factual issue is uncontested by the defense.  (*People v. Mil* (2012) 53 Cal.4th 400, 410 ["the omission of an element of a . . . sentencing factor is harmless when 'the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error.'"]; *People v. Garcia* (2001) 25 Cal.4th 744, 761 [same].)  Appellant claimed that

Claudia consented to the encounter and never argued that the asportation did not substantially increase the risk of harm to her. Further, the evidence that it did so was overwhelming. Claudia testified that appellant moved her into the car, drove it into the alley, and blocked any exit from the passenger side by parking next to a wall. The driver's side doors were also locked. This allowed appellant to move his victim from a public street into a secluded, confined space that he controlled, and forced her into close quarters with appellant and his gun. This evidence strongly supported the inference that appellant's movement substantially increased the risk of harm to Claudia by increasing the "danger inherent in a victim's foreseeable attempts to escape, or enhance[ing] the attacker's opportunity to commit additional crimes," as well as substantially decreasing "the possibility of detection, escape or rescue." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152-1153.) Appellant's testimony to the contrary was marked by inconsistencies and lacked any support from other witnesses. Thus, any failure to instruct the jury as to the One Strike kidnapping enhancement was harmless beyond a reasonable doubt.

## XVIII. *Unauthorized Sentence on Count Four*

On the count four conviction for forcible rape of Claudia, appellant was sentenced to 25 years to life under the One Strike law (§ 667.61, subds. (a)-(d)) and that sentence was doubled under the Three Strikes law (§ 1170.12(a)-(d) & 667, subds. (b)-(i)). Appellant contends this was unauthorized under section 667.61 and therefore requires a new sentencing hearing. His argument is brief, unsupported, and inscrutable. We therefore conclude that he has failed to demonstrate error.

In his opening brief, appellant stated that the One Strike sentence of 25 years to life, "doubled under the Three Strikes law, constitutes an unauthorized punishment" for his One Strike crime. Respondent interpreted this statement as a challenge to the doubling of the One Strike sentence under the Three Strikes law, from 25 years to life to 50 years to life. As respondent points out, the court was entitled to set the minimum term of 25 years under the One Strike law, and then double it under the Three Strikes law. (*People v. Acosta* (2002) 29 Cal.4th 105, 123–124 (*Acosta*) ["the Three Strikes law itself imposes the indeterminate life term and requires reference to the One Strike law only in calculating the minimum term for that indeterminate sentence"].)

Appellant does not dispute this point. Instead, in reply, he argues that *Acosta* "never addressed the issue presented," which he then characterizes as an irreconcilable tension between section 667, subdivisions (c)(5), (e)(1), and (e)(2)(A)(i) of the Three Strikes law and the One Strike law when "used in calculating the minimum term." Appellant did not make this argument or cite to these provisions of the Three Strikes law in his opening brief, and he may not do so for the first time in his reply. (See, e.g., *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 ["Withholding a point until the reply brief deprives the respondent of an opportunity to answer it. . . . Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before."].)

Appellant also cites to the former section 667.61, subdivision (j), which allowed the 25-year minimum term to be reduced by up to 15 percent for conduct credits. This provision was eliminated in 2006. (Stats. 2006, ch. 337, § 33.) To the extent he seeks to raise an argument regarding a purported

69

conflict between this section and the Three Strikes law, he has failed to provide sufficient legal argument, or any authority, to satisfy his burden on appeal. (See *People v. Barnett, supra,* 17 Cal.4th at p. 1182 [the failure to support claim with adequate argument forfeits the claim as not properly raised]; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived"].)

## XIX. *Admission of Prior Conviction*

Appellant seeks reversal of his admission of his prior burglary conviction, arguing that the trial court failed to properly advise him of its consequences. We find no error.

A. Factual background

During his testimony, appellant admitted his 2003 convictions for assault and battery and his 2001 conviction for burglary. Later, while the jury was deliberating, the court asked defense counsel about the prior conviction allegations. She responded that she had talked to appellant "at length," and, after a further conference with appellant, told the court that appellant had already admitted the prior convictions during his testimony, "so he'll admit."

The court noted that there were two prior convictions alleged in the information – the first degree residential burglary from 2001 and the assault by means of force likely to produce great bodily injury in 2003. The court told appellant that the burglary "is alleged as a strike . . . within the meaning of the Three Strikes law, which means any penalties are doubled if you are convicted of any felony in this case." Appellant stated that he understood. The court also advised appellant that if he had two

70

prior felony convictions, then he would be ineligible for probation.

The court advised appellant of his constitutional rights, including his right to a jury trial, to confront and cross-examine witnesses, to present a defense, and to remain silent.  The court also repeated twice that "if you admit these two prior convictions, that means if you're convicted of any felony by this jury, then there won't be a trial and it will count as a strike within the meaning of the Three Strikes law for this case, and you'll be ineligible for probation on this case."  The court also advised appellant that it "always has the discretion to dismiss a prior strike." Appellant confirmed that he understood the advisements and wished to admit the prior convictions.  Accordingly, the court found that appellant had expressly and intelligently waived his rights and his admissions were free and voluntary, understanding the priors and the consequences of finding them true.

B.      Governing principles

When a criminal defendant admits a prior conviction allegation that subjects him to increased punishment, the trial court is required to ensure that the plea is knowing and voluntary.  (*People v. Cross* (2015) 61 Cal.4th 164, 170 (*Cross*).) The court must "inform the defendant of three constitutional rights -- the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers -- and solicit a personal waiver of each [*Boykin-Tahl* waivers]." (*Ibid.*, citing *Boykin v. Alabama* (1969) 395 U.S. 238, 243-244, and *In re Tahl* (1969) 1 Cal.3d 122, 130-133.)  In addition, under a "judicially created rule of criminal procedure" (*Cross, supra*, at p. 179, citing *In re Yurko* (1974) 10 Cal.3d 857, 863-864 (*Yurko*)), the trial court must advise the defendant "of the precise increase

71

in the prison term that might be imposed, the effect on parole eligibility, and the possibility of being adjudged a habitual criminal." (*Cross, supra*, at pp. 170-171.) "The failure to properly advise a defendant of his or her trial rights is not reversible 'if the record affirmatively shows that [the admission] is voluntary and intelligent under the totality of the circumstances.'" (*Id*. at p. 179, quoting *People v. Howard* (1992) 1 Cal.4th 1132, 1175.)

    C.    Analysis

    Appellant argues that the trial court failed to properly advise him under *Yurko* of the penal consequences of admitting his prior conviction allegations. As an initial matter, respondent argues appellant forfeited this objection by failing to raise it at sentencing. We agree. Advisement of the penal consequences of admitting a prior conviction allegation is not constitutionally mandated. (See *Cross, supra*, 61 Cal.4th at pp. 170–171; *People v. Wrice* (1995) 38 Cal.App.4th 767, 770; *Yurko*, supra, 10 Cal.3d at p. 864.) "Consequently, when the only error is a failure to advise of the penal consequences, the error is waived if not raised at or before sentencing." (*People v. Wrice, supra*, at pp. 770–771.)

    In any event, we conclude that the trial court adequately advised appellant of the penal consequences of his admission. The court advised appellant that his admission of the burglary conviction was a strike that could double his sentence and, together with his other prior conviction, render him ineligible for probation. The court also told appellant that it had the discretion to dismiss a prior strike. Although appellant asserts that he should have been advised about the effects of the Three Strikes law on his conduct credits and eligibility for a youthful offender parole hearing, he cites no authority for this premise, nor does he respond to the contrary authority cited by respondent. (See

*People v. Barella* (1999) 20 Cal.4th 261, 263 [finding a "defendant's parole eligibility date is not a direct consequence of which a defendant must be apprised before pleading guilty," nor is the "credit limitation contained within the Three Strikes law"].) We also note that appellant admitted his prior convictions during his testimony at trial. Thus, under the totality of the circumstances, the record demonstrates that appellant's admission of his prior conviction was knowing and voluntary.

## XX. *Admission of Prior Conviction for Purpose of Enhancements*

The trial court imposed two five-year enhancements, on counts one and four, based on appellant's admitted prior strike conviction pursuant to section 667, subdivision (a)(1). In a two-paragraph argument, appellant contends that he admitted his prior conviction "for purposes of the Three Strikes allegation," but not "for purposes of the section 667(a) enhancement allegation." He therefore contends that the enhancements imposed constitute "an unauthorized sentence." Apart from referring to his arguments in section XIX, *ante*, he cites no authority for this contention. Thus, we find no error for the same reasons discussed in that section. To the extent appellant seeks to make a distinct argument regarding the section 667 enhancement, he has failed to adequately do so and we consider it forfeited. (See *People v. Barnett, supra,* 17 Cal.4th at p. 1182; *Jones v. Superior Court, supra,* 26 Cal.App.4th at p. 99.)

## XXI. *Request for* Franklin *Remand*

Appellant seeks remand for a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261, so that he may present information relevant to an eventual section 3051 youthful offender parole hearing. Pursuant to section 3051, offenders 25

years of age and younger at the time of their offense are eligible for a youth offender parole hearing after a specified number of years in prison.  (§ 3051, subds. (a)–(b).)  Appellant was 22 years old when he committed the instant offenses.  However, he was ineligible for a section 3051 hearing because he was sentenced under the One Strike law and for his prior felony under the Three Strikes law. (§ 3051, subd. (h) (3051(h).)  He now contends that the exclusion of One Strike and Three Strikes offenders under section 3051(h) violates equal protection.

Appellant relies on *People v. Edwards* (2019) 34 Cal.App.5th 183, 197 (*Edwards*), in which the court concluded that the section 3051(h) carve-out for One-Strike offenders sentenced pursuant to section 667.61 was unconstitutional.  The *Edwards* court found "no rational relationship between the disparity of treatment [of One-Strike offenders] and a legitimate governmental purpose" (*ibid.*), noting that section 3051 included "first degree murderers but exclude[d] One Strikers" (*id.* at p. 195).  He asks us to disregard the decisions reaching the opposite conclusion, including *People v. Williams* (2020) 47 Cal.App.5th 475, review granted July 22, 2020, S262191 (*Williams*) and *People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1164 (*Wilkes*).

In *Williams*, *supra*, 47 Cal.App.5th at pp. 492-493, the court rejected the reasoning of *Edwards* and concluded that there was no equal protection violation in the exclusion under section 3051(h) for one-strike offenders.  The *Williams* court distinguished *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*), on which *Edwards* heavily relied, as *Contreras* involved a constitutional challenge to life without parole sentences under the Eighth Amendment's prohibition of cruel and unusual punishment.  (*Williams*, *supra*, 47 Cal.App.5th at

pp. 490, 492-493, discussing *Contreras, supra*, 4 Cal.5th at p. 382.) The court found that "the threat of recidivism by violent sexual offenders—as demonstrated by the Legislature's enactment of several comprehensive statutory schemes to curb such recidivism among such offenders—provides a rational basis for the Legislature's decision to exclude one-strikers from the reach of section 3051." (*Williams, supra*, 47 Cal.App.5th at p. 493, citing *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881; see also *People v. Turnage* (2012) 55 Cal.4th 62, 74–75 (*Turnage*) [noting the standard of rationality neither "depend[s] upon whether lawmakers ever actually articulated the purpose they sought to achieve," "[n]or must the underlying rationale be empirically substantiated"]; *People v. Luna, supra*, 209 Cal.App.4th at p. 471 [observing that section 667.61 "'was enacted to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction'"].)

We agree. Like *Williams, supra*, 47 Cal.App.5th at p. 493, "[g]iven the deferential standard we apply in determining rationality for equal protection purposes (see *Turnage, supra,* 55 Cal.4th at p. 74), and given our view that the risk of recidivism provides a rational basis for the Legislature to treat violent felony sex offenders sentenced under the one-strike law differently than murderers or others who commit serious crimes," we reject appellant's equal protection challenge to the carve out for one-strike offenders under subdivision (h) of section 3051.

Appellant's equal protection challenge to the exclusion under section 3051(h) for offenders sentenced under the Three Strikes law also fails. In *Wilkes*, the court rejected such a challenge: "Numerous courts have rejected equal protection challenges to the differential treatment of Three Strikes

offenders, concluding that such offenders are not similarly situated to non-recidivist offenders and/or that a rational basis exists to treat them differently . . . 'It is reasonable for the Legislature to distinguish between those felons . . . who come to court with a history of serious or violent felony convictions and those who do not.'" (*Wilkes, supra,* 46 Cal.App.5th at 1165.) The court concluded that "[a]ssuming a Three Strikes youth offender is similarly situated to other youth offenders for purposes of section 3051, the Legislature could rationally determine that the former—'a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal justice system' [citation]—presents too great a risk of recidivism to allow the possibility of early parole." (*Id.* at pp. 1165-1166, citing *People v. Cooper* (1996) 43 Cal.App.4th 815, 829; *People v. Kilborn* (1996) 41 Cal.App.4th 1325, 1332 ["The system of imposing greater punishment on all persons who commit a felony-grade crime after having committed one or more serious or violent felonies in the past, is rationally related to the legitimate public objective of discouraging recidivism"].) The *Wilkes* court found the reasoning in *Edwards* regarding first time offenders sentenced under the One Strike law to be inapplicable to a defendant with a prior criminal history sentenced under the Three Strikes law. (*Wilkes, supra,* 46 Cal.App.5th at 1166-1167.)

As such, we reject appellant's challenge to section 3051 and affirm the trial court's conclusion that he was ineligible for a youthful offender parole hearing.

## XXII. *Remand to Exercise Discretion Under Section 1385*

Appellant requests that we remand the matter to allow the trial court to exercise its discretion to strike the prior felony enhancements under section 667, subdivision (a) (section 667(a)).

76

On September 30, 2018, the Governor signed Senate Bill No. 1393 (2017-2018 Reg. Sess.) (S.B. 1393), amending sections 667(a) and 1385 to provide the trial court with discretion to strike enhancements for serious felony convictions. The legislative changes became effective January 1, 2019.

Appellant was sentenced in April 2019, three months after S.B. 1393 became effective. Respondent contends that remand is unwarranted, as the trial court was aware of its discretion under the amended statute and chose not to strike the enhancements. In imposing the indeterminate portion of the sentence, the court stated: "I will impose a five year prior under 667[(a)(1)] for the residential burglary because these charges involve strikes." Then, when imposing the determinate part of the sentence, the court stated: "I must—or I will impose a five-year prior under this sentencing scheme." Respondent argues that the court's inclusion of a basis for imposing the enhancement suggests it knew it was no longer mandatory.

However, as respondent acknowledges, the prosecutor's sentencing memorandum incorrectly told the trial court that it could *not* strike or stay the section 667(a) enhancements. Neither party corrected this error at sentencing, and the court did not acknowledge it or otherwise indicate it was aware of its discretion.

"Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) "Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the

77

trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) "Remand for resentencing is not required, however, if the record demonstrates the trial court was aware of its sentencing discretion. . . . Further, remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion. Error may not be presumed from a silent record. . . . "'[A] trial court is presumed to have been aware of and followed the applicable law.'"" (*Id.* at pp. 1228-1229, citations omitted; see also *People v. Lee* (2017) 16 Cal.App.5th 861, 867 ["If the record is silent . . . the defendant has failed to sustain his burden of proving error, and we affirm."].)

We disagree with respondent's contention that the record was "silent" as to the court's discretion, where the sentencing memorandum affirmatively misstated the law and there is no indication that the court understood otherwise. Moreover, the record before us does not clearly indicate the court would have declined to strike the five-year enhancement, even if it understood its discretion to do so. While the court denied appellant's request to impose concurrent sentences on some of the counts, finding multiple circumstances in aggravation and none in mitigation, it also expressly chose not to sentence appellant to "the absolute maximum," instead staying the gun enhancement on three out of four counts. We accordingly remand the matter for the trial court to exercise its discretion whether to strike the enhancements under section 667(a)(1). We express no opinion as to how the trial court should exercise its discretion on remand.

**XXIII. *Request for In Camera Review***

After the jury was sworn and prior to opening statements,

78

the court granted defense counsel's request for an ex parte hearing. Appellant requests that we review the sealed portion of the transcript regarding this hearing "to determine if any in camera ruling violated defendant's statutory or constitutional rights or impacted any of the issues raised on appeal." Respondent does not object. We have reviewed the transcript and find no rulings violating appellant's rights or impacting issues raised on appeal.

## XXIV. *Challenge to Imposition of Fines and Fees*

Appellant contends the trial court erred by requiring him to pay restitution fines and court assessment fees without finding that he had the ability to pay them. As support for this claim, appellant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).)

At sentencing, the trial court imposed a $1,600 restitution fine (§ 1202.4, subd. (b)), a $320 court operations assessment (§ 1465.8, subd. (a)(1)), and a $240 court construction fee (Gov. Code, § 70373).[12] At the time of sentencing, the statutory minimum fine under section 1202.4 was $200. Thus, the $1,600 restitution fine the trial court imposed exceeded the statutory minimum. Even prior to *Dueñas*, section 1202.4 permitted a defendant to present information regarding his or her ability to pay any fine amount above the minimum. (§ 1202.4, subd. (c).) Thus, by failing to object to the restitution fine and to present evidence he did not have the ability to pay it, appellant forfeited the argument that the trial court erred in imposing the fine without considering his ability to pay. (See *People v. Avila* (2009)

---

[12]We discuss the corrections to these amounts in section XXV, *post*. We have used the corrected amounts here.

46 Cal.4th 680, 729; *People v. Smith* (2020) 46 Cal.App.5th 375, 395; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)

Respondent contends that appellant also forfeited his right to object to the non-punitive court operations assessment and court construction fees. We agree. Appellant was sentenced in April 2019, three months after *Duenas* was issued. Because appellant failed to object to any fines or fees at sentencing, he has forfeited this challenge. (See *People v. Frandsen, supra,* 33 Cal.App.5th at p.1153; *People v. Avila, supra,* 46 Cal.4th at p. 729.)

## XXV. *Correction to Fines and Fees Imposed*

Respondent also contends that the trial court erred in calculating the amounts of fines and fees imposed, resulting in an unauthorized sentence. Appellant did not respond to this claim.

At the sentencing hearing, the court imposed the minimum restitution fine of $200 per count, and imposed and stayed a parole revocation fine in the same amount of $200 per count. The court also stated it was imposing "all other mandatory court fees," which would include court operations assessments under section 1465.8, subdivision (a)(1) and court construction fees under Government Code section 70373.

However, the court's minute order and abstract of judgment incorrectly reflect a *single* $200 restitution fine and $200 parole revocation fine. Because we reversed the conviction on count two, the correct total is now two fines of $1,400 each, calculated as $200 times seven counts. In addition, the minute order and abstract of judgment reflect $140 in court operations assessments and no court construction fees. It appears this calculation was based on the status of these fees at the time of

the crimes in 2004—at that time, the court operations assessment under the prior version of section 1465.8 was $20[13] and the fee provision of Government Code section 70373 had not yet been enacted.  However, fees are properly imposed as of the date of conviction, not the date of commission of the crimes.  (See *People v. Davis* (2010) 185 Cal.App.4th 998, 1001 [fees imposed upon "conviction," i.e., "upon the return of a guilty verdict by the jury or by the entry of a plea admitting guilt"]; *People v. Alford* (2007) 42 Cal.4th 749, 754 ["the Legislature intended to impose the court security fee to all convictions after its operative date"].)  Thus, the court was required to impose a court operations assessment of $40 per count, totaling $280, under the applicable version of section 1465.8, subdivision (a)(1), and a court construction fee of $30 per count, totaling $210, under Government Code section 70373.

"These matters are mandatory (see *People v. Woods* (2010) 191 Cal.App.4th 269, 272–273 [court facility assessment, restitution fine, and court security fees are mandatory]; *People v. Guiffre* (2008) 167 Cal.App.4th 430, 434 [imposition of previously stayed section 1202.44 probation revocation fine is mandatory upon revocation of probation with state prison sentence]) and may be added on review." (*People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543, fn. 2 citing *People v. Mitchell* (2001) 26 Cal.4th 181, 185–188.)  Therefore, upon remand, we direct the trial court to correct the abstract of judgment to reflect $1,400 in restitution fines, $1,400 in parole revocation fines, $280 in court

---

[13]It seems the court used the 2004 value of $20 and multiplied it across seven counts, rather than eight, for a total of $140.

operations assessments, and $210 in court construction fees.

## DISPOSITION

We reverse the conviction for kidnapping on count two. The matter is remanded for the limited purpose of allowing the trial court to consider, at a hearing at which appellant has a right to be present with counsel, whether to exercise its discretion to strike the prior prison term pursuant to section 667(a). If the court elects to exercise this discretion, appellant shall be resentenced. We also direct the trial court to correct the fines and fees imposed in the abstract of judgment as detailed herein. The judgment is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


MANELLA, P. J.


CURREY, J.